WILLIAM KINNEY AND JAMES J. MECHIE, EXECUTORS AND TRUSTEES OF ROBERT PORTERFIELD, DECEASED, *v.* MERIWETHER L. CLARK, WILLIAM P. CLARK, GEORGE R. H. CLARK, AND JEFFERSON R. CLARK, A MINOR BY THE AFORESAID GEORGE R. H. CLARK HIS GUARDIAN, HEIRS AND DEVISEES OF WILLIAM CLARK, DECEASED, AND ROBERT O., ANN C., GEORGE W., AND FRANCES JANE WOOLFOLK, HEIRS OF GEORGE WOOLFOLK, DECEASED, AND OTHERS.

An act of the legislature of Virginia, passed in May, 1779, " establishing a land-office, and ascertaining the terms and manner of granting waste and unappropriated lands," contained, amongst other exceptions, the following, viz. :

no entry or location of land shall be admitted within the country and limits of the Cherokee Indians.

The tract of country lying on the west of the Tennessee river, was not then the country of the Cherokee Indians, and, of course, not within the exception.

A title may be tried in Virginia, Kentucky, and Tennessee, as effectually upon a *caveat* as in any other mode; and the parties, as also those claiming under them, are estopped by the decision.

The boundaries of the Cherokees, as fixed by treaties, historically examined, and also the nature, limits, and effect of the grant to Henderson and Company.

Whatever lands in Virginia were not within the exceptions of the act of 1779, were subject to appropriation by Treasury warrants.

As the rule is settled, that the decisions of state courts, construing state laws, are to be adopted by this court, and as the courts of Kentucky have decided that an entry was required to give title on a military warrant, in the military district, this court decides that the legislative grant of Virginia to her officers and soldiers, would not, of itself, prevent the statute of limitations of Kentucky from attaching.

The Kentucky act of 1809, applied to the Chickasaw country on the west of the Tennessee river, as far as treaties would permit; and upon the extinguishment of the Indian title, this act, together with all the other laws, was extended over the country.

THIS case was brought up by appeal from the Circuit Court of the United States for the district of Kentucky, sitting as a court of equity, and arose upon the following state of facts.

On the 19th December, 1778, the General Assembly of Virginia passed a joint resolution, declaring that a certain tract of country, to be bounded by the Green river and a south-east course from the head thereof to the Cumberland mountains, with the said mountains to the Carolina line, with the Carolina line to the Cherokee or Tennessee river, with the said river to the Ohio, and with the Ohio to Green river, ought to be reserved for supplying the officers and soldiers of the Virginia line with the respective proportions of land, which have been or may be assigned to them by the General Assembly, saving and reserving the land granted to Richard Henderson and Company, and their legal rights to such persons as have heretofore actually located lands and settled thereon, within the bounds aforesaid.

In May, 1779, every purchase of lands, theretofore made by or on behalf of the crown of Great Britain, from any nation of Indians within the limits of Virginia, was declared to enure to the benefit of that commonwealth, and all sales and deeds made by any Indian, or nation of Indians, to or for the separate use of any person or persons, were pronounced void.

G 2

In May, 1779, also, an act was passed by the General Assembly " for establishing a land-office, and ascertaining the terms and manner of granting waste and unappropriated lands." This act contained, amongst other things, the following restrictions :—" No entry or location of land shall be admitted within the country and limits of the Cherokee Indians, or on the north-west side of the Ohio river, or on the lands reserved by act of Assembly for any particular nation or tribe of Indians, or on the lands granted by law to Richard Henderson and Company, or in that tract of country reserved by resolution of the General Assembly for the benefit of the troops serving in the present war, and bounded by the Green river and south-east course from the head thereof to the Cumberland mountains, with the said mountains to the Carolina line, with the Carolina line to the Cherokee or Tennessee river, with the said river to the Ohio river, and with the Ohio to the said Green river, until the further order of the General Assembly."

In October, 1779, an act was passed " for more effectually securing to the officers and soldiers of the Virginia line, the lands reserved to them," &c.

The first section imposed a heavy penalty on settlers who should not evacuate the reserved lands.

The second ascertained the proportions or quantity of land to be granted, at the end of the war, to the officers of the Virginia line, on continental or state establishment, or to the officers of the navy ; and it was also provided that where any officer, soldier, or sailor, shall have fallen or died in the service, his heirs or legal representatives shall be entitled to, and receive, the same quantity of land as would have been due to such officer, soldier, or sailor, respectively, had he been living.

On the 18th of May, 1780, Colonel George Rogers Clark, (under whom the defendants claim,) upon sundry Treasury warrants, made with the surveyor several entries of land, in all amounting to 74,962 acres, lying in the then state of Virginia, below the Tennessee river ; and afterwards, said Clark, in like manner, on the 26th October, 1780, amended his said entries, " to begin on the Ohio at the mouth of the Tennessee river, running down the Ohio, bounded by the drowned lands of the said rive and waters of the Mississippi, for the quantity of 74,962 acres, in one or more surveys.

In October, 1780, an act passed " for making good the future pay of the army."

It allowed a major-general 15,000 acres of land, and a brigadier-general 10,000.

It entitled the legal representative of any officer who may have died in the service before the bounty of lands granted by that or any former law, to demand and receive the same in like manner as the officer himself might have done. And as a testimony of the high sense the General Assembly of Virginia entertained of the important services rendered the United States by Major-General Baron Steuben, it was further enacted that 15,000 acres of land be granted to the said Major-General Baron Steuben, in like manner as is herein-before granted to other major-generals.

In November, 1781, an act passed "to adjust and regulate the pay and accounts of the officers and soldiers of the Virginia line," &c.

The eighth section declared "That whereas a considerable part of the tract of country allotted for the officers and soldiers by an act of Assembly, entitled 'An act for establishing a land-office,' &c., hath, upon the extension of the boundary line between this state and North Carolina, fallen into that state, and the intentions of the said act are so far frustrated, Be it therefore enacted, That all that tract of land included within the rivers Mississippi, Ohio, and Tennessee, and the Carolina boundary line, shall be and the same is hereby substituted in lieu of the lands so fallen into the said state of North Carolina, to be in the same manner subject to be claimed by the said officers and soldiers."

The ninth section required the governor, as soon as the circumstances of affairs would admit, to appoint surveyors for the purpose of surveying and apportioning the lands theretofore reserved to the officers and soldiers agreeably to their ranks, in such manner and in such proportions as were allowed by act of Assembly as a bounty for military services.

The officers were authorized to depute and appoint as many of their number as they might think proper, to superintend the laying off the lands, with power to choose the best of the same thus to be allotted, and point out the same to the surveyors who were required to make the surveys, and be subject to the orders of the superintendents throughout the survey.

After the survey, the portions of each rank were to be numbered, and the officers and soldiers were to proceed to draw lots according to their respective ranks, and to locate as soon as they thought proper.

The twelfth section provided "That the bounties of land given

to the officers and soldiers of the Virginia line in continental service, and the regulations for the surveying and appropriating the same, shall be extended to the state officers.

In May, 1782, an act was passed, entitled " An act for providing more effectual funds for the redemption of certificates granted the officers and soldiers raised by this state."

The seventh section provided that, " Whereas it is necessary that the number of claims to any part of the lands appropriated for the benefit of the said officers and soldiers should be speedily ascertained ; Be it therefore enacted, That all persons having claims as aforesaid, be required, and they are hereby directed, to transmit authenticated vouchers of the same to the war-office, on or before the first of January next," and those without the state were required to do the same on or before the first of June.

The eighth section directed the register of the land-office to grant, to the officers and soldiers, warrants for the lands allotted them, upon producing a certificate of their respective claims from the commissioner of war.

The ninth section enacted " That any officer or soldier who hath not been cashiered or superseded, and who hath served the term of three years successively, shall have an absolute and unconditional title to his respective apportionment of the land appropriated as aforesaid."

The tenth section contained this proviso, " Provided always, and it is hereby enacted, that no surveyor shall be permitted to receive any location upon any warrant for lands within the country reserved for the officers and soldiers, until the apportionment and draft for the same, as directed by the act entitled " An act to adjust and regulate the pay and accounts of the officers and soldiers of the Virginia line."

On the 18th of December, 1782, a warrant was issued to Robert Porterfield, (the complainant,) as the heir of Colonel Charles Porterfield, deceased, for 6000 acres of land ; and on the 13th of June, 1783, a warrant was issued to Thomas Quarles for 2666⅔ acres, which warrant was afterwards assigned to Porterfield, the complainant.

In October, 1783, an act was passed, entitled " An act for surveying the lands given by law to the officers and soldiers of continental and state establishments," &c.

For the better locating and surveying the lands, given by law to

the officers and soldiers on state and continental establishments, it enacted that it should be lawful for the deputation of officers, consisting of Major-General Peter Muhlenberg and others, who are enumerated, to appoint superintendents on behalf of the respective lines, or jointly, for the purpose of regulating the surveying of the lands appropriated by law as bounties for the said officers and soldiers. That the deputations should have power to appoint two principal surveyors; that the holders of land-warrants for military bounties, given by law as aforesaid, should, on or before the 15th of March thereafter, deliver the same to the principal surveyors, &c.

The second section declared that priority of location should be by lot, under the direction and management of the principal surveyors and superintendents. That the warrants delivered to the principal surveyors before the 10th of March, should be surveyed first, and those subsequently delivered, in the order of priority.

The third section required the location and surveys to be made under the direction of the superintendents.

The fourth section directed where, and how, the lands were to be surveyed. Those lying on the Cumberland and Tennessee were to be surveyed first; and afterwards those on the north-west side of the Ohio river, until the deficiency of all military bounties, in lands, should be fully and amply made up. " Whatever lands may happen to be left," the act declares, " within the tract of country reserved for the army, on this side the Ohio and Mississippi, shall be saved, subject to the order and particular disposition of the legislature of this state." And the governor was required to furnish the superintendents with such military aid as he might judge necessary to carry the act into effect. The aid was to be ordered from the Kentucky country, and was not to exceed a hundred men.

In the spring of 1784, the superintendents repaired to Kentucky. They found the country below the Tennessee in possession of the savages, who threatened resistance. The aid expected from Kentucky was not furnished. The attempt to enter and survey the lands was, consequently, abortive. But the superintendents proceeded to determine the priority of locations by lot; and entries were made on the books of the surveyors, to the extent of some two or three hundred thousand acres.

Porterfield's entries were of the number. They were made under the authority of the two warrants which have been already stated.

In June, 1784, two surveys were made for Clark by the surveyor

Vol. II.—11

of Lincoln county, under the authority of the warrants already stated as land-office Treasury warrants. One of these surveys was for 36,962 acres, and the other for 37,000 acres.

In August, 1784, Porterfield made his entries.

*Caveats* were entered against the surveys of Clark, which prevented patents from being issued. These were entered in the District Court of the then District of Kentucky, by the superintendents of the Virginia state line, and were not disposed of until after the separation of Kentucky from Virginia.

In October, 1784, the legislature of Virginia interposed to prevent the military claimants from taking possession of the lands. The preamble to the act stated, " that it had been represented to the present General Assembly that the taking possession of, or surveying the lands in the western territories of this state, which have been granted by law as bounties to the officers and soldiers of the Virginia line, will produce great disturbances;" and the governor, with the advice of council, was authorized to suspend, for such time as he may think the tranquillity of the government may require, the surveying or taking possession of those lands that lie on the north-west side of the river Ohio or below the mouth of the river Tennessee, and which have been reserved, &c.

On the 6th of January, 1785, Governor Henry accordingly issued his proclamation to the effect authorized by this act.

In November, 1785, and January, 1786, three treaties were made with the Indians at Hopewell, by commissioners on the part of the United States; the first, in November, with the Cherokees, and the other two in the following January, with the Choctaws and Chickasaws. That with the Choctaws bears date on the 3d, and that with the Chickasaws on the 10th of January, 1786. By the treaty with the Cherokees the boundary was established as follows. Beginning at the mouth of Duck river, on the Tennessee; thence running northeast to the ridge dividing the waters running into Cumberland from those running into the Tennessee; thence eastwardly along the said ridge to a north-east line to be run which shall strike the river Cumberland forty miles above Nashville; thence along the said line to the river; thence up the said river to the ford where the Kentucky road crosses the river, thence to Campbell's line, near Cumberland gap, &c., &c., &c. The treaty with the Chickasaws established the following boundary: Beginning on the ridge that divides the waters running into the Cumberland from those running into the Tennessee,

at a point in a line to be run north-east which shall strike the Tennessee at the mouth of Duck river; thence running westerly along the said ridge till it shall strike the Ohio; thence down the southern bank thereof to the Mississippi; thence down the same to the Choctaw line of Natchez district; thence along the said line, or the line of the district, eastwardly, as far as the Chickasaws claimed, and lived, and hunted on, the twenty-ninth of November, one thousand seven hundred and eighty-two.

The fourth article of the treaty with the Chickasaws was as follows: "If any citizen of the United States, or other person, not being an Indian, shall attempt to settle on any of the lands hereby allotted to the Chickasaws to live and hunt on, such persons shall forfeit the protection of the United States of America; and the Chickasaws may punish him or not, as they please."

In 1793, the *caveat* which had been filed against Clark by the superintendents of the Virginia state line, was dismissed, in Kentucky, pursuant to the opinion of the Court of Appeals of Virginia, given in 1791.

In 1794, the General Assembly of Kentucky passed an act requiring the register of the land-office to receive, and issue grants on, all certificates of survey which were in the register's office of Virginia at the time when the separation took place, and on which grants had not issued.

On the 15th of September, 1795, grants were issued by Kentucky to Clark for the 73,962 acres.

In 1809, the legislature of Kentucky passed an act, the second section of which declares, "That no action at law, bill in equity, or other process, shall be commenced or sued out by any person or persons claiming under, or by, an adverse interfering entry, survey, or patent, whereby to recover the title or possession of such land from him or her who shall hereafter settle on land to which he or she shall, at the time of such settlement made, have a connected title in law or equity, deducible of record from the commonwealth; and when such settler shall have acquired such title or claim after the time of settlement made, the limitation shall begin to run only from the time of acquiring such title or claim, but within seven years next after such settlement made, &c.

In October, 1818, a treaty was made between the United States and the Chickasaws, by which the Chickasaws ceded to the United States all the land between the Tennessee, Ohio, and Mississippi

rivers and a line therein described on the south, which cession included the lands in controversy.

On the 22d of December, 1818, the legislature of Kentucky passed an act prohibiting any entry or survey from being made " on any portion of the land lying within the late Chickasaw Indian boundary."

In July, 1819, William Clark, the assignee of George Rogers Clark, the patentee, took possession of the land and placed tenants upon it.

On the 14th February, 1820, the legislature of Kentucky passed an act providing for the appointment of a superintendent to survey the lands west of the Tennessee river.

On the 26th of December, 1820, the military surveyor was permitted to survey the entries that had been made prior to the year 1792, when Kentucky became an independent state. Porterfield's surveys were commenced and continued from time to time until 1824 and 1825. Five surveys were made at different times during this period, and five patents were issued in conformity with them, which bear date in the last-mentioned years. In May, 1824, Porterfield took possession, by his tenants, of several of the tracts patented to him, and leased them for five years.

In October, 1825, these tenants were turned out of possession by writs of forcible entry and detainer.

Some conveyances and legal proceedings occurred, during the period of which we have spoken; but, as they have no bearing upon the questions before the court in the present case, they have not been mentioned in the statement.

In July, 1836, Porterfield filed his bill in the Circuit Court of the United States for the district of Kentucky, sitting as a court of equity, which, together with two amended bills and a bill of revivor, after having brought into court various parties who were supposed to have an interest in the matter, presented the following claim, charges, and prayer.

The bill, after setting forth the title of the complainant, as founded upon the patents of 1824, 1825, and 1826, and alleging that the possession of the country by the Indians was the cause of the delay between the entries and surveys, charged that the defendant, Clark, had no right to make an entry or location on any lands west of the Tennessee river, or on the lands included between the rivers Ohio, Tennessee and Mississippi, and the North Carolina line, on land-office Treasury-warrant certificates; that, by law, he, Clark, was expressly

prohibited from making the said entry or location on land within the country and limits of the Cherokee Indians, or the lands reserved by the Virginia Assembly for any particular nation or tribe of Indians, or in that tract of country reserved by resolution of the General Assembly of the state of Virginia for the benefit of the troops serving in the then existing war between Great Britain and the United States of America. The bill avers that the entry of George Rogers Clark was made on lands reserved by resolution of the Assembly of Virginia for the troops then in the service of the United States; that it was made on lands reserved by law for the Indian tribes, and upon lands within the country and limits of the Cherokee Indians. The bill further charges that the said warrants were, by law, prohibited from being located on any lands that were not waste and unappropriated; that, at the time of the entries, the Indian title to said lands west of the Tennessee river and included within the rivers Ohio, Mississippi, Tennessee, and the North Carolina boundary-line, was not extinguished. The bill further charges that the entry of Clark is not precise and special, but vague, uncertain, and void; because it called to begin on the Ohio at the mouth of the Tennessee river, running down the Ohio, bounded by the drowned lands of said river and waters of the Mississippi for the quantity of 74,962 acres in one or more surveys; and moreover that the person who in fact made such survey was not an authorized and legally appointed surveyor. It then charges that the titles of Clark, and all who claim under him, are void, and prays for a decree compelling them to release their claims to the complainant, and account to him for the rents and profits of the land.

A supplemental bill and answer were afterwards filed, but the matters therein stated are not before the court in the consideration of this case; the charges made in the bill being denied in the answer, and no proof being offered to sustain them.

The defendants all answered; but as they all rely on the same matters of defence, it is not material to notice any of the answers but that of William Clark. He contests, throughout, the right of Porterfield to relief; denies that any part of the land in contest was possessed by Porterfield at the time of filing his bill; on the contrary, he alleges, that by his tenants, he had for more than seven years next before the filing of the bill, been in full and exclusive possession of all the land in contest, claiming and holding the same under the title derived from George Rogers Clark, and he therefore pleads and

relies upon his possession and the statute of Kentucky, limiting the time of bringing suits in such cases to seven years, in bar of the relief sought by Porterfield.  He insists that at the date of Clark's entries, there was no law prohibiting the location of Treasury warrants below the Tennessee river, and that the entries were made on land subject to appropriation, and in conformity with law; that they possess the certainty and precision of valid entries, and were afterwards legally surveyed in conformity with law, upon which surveys patents finally issued according to law ; and that his title is not only elder in date, but superior in law and equity to that of Porterfield.

Amongst the other matters given in evidence in this case, were copies of some original papers found in the State Paper Office, in London, relating to the boundary-lines adopted at various times between the white people and the Indians, the substance of which is as follows :

1. Deed (or treaty) with the Cherokees, dated on the 13th of June, 1767, which recited that a previous treaty had been made on the 20th of October, 1765, directing the line to be run from where the South Carolina line terminated, a north course into the mountains, whence a straight line should run to the lead mines of Colonel Chiswell, (on the Great Kenhawa river,) and that the commissioners had found themselves unable to run the line further than the top of a mountain called Tryon mountain, on the head waters of Pacolet creek and White Oak creek, therefore the present treaty established the following :—Running from the top of Tryon mountain aforesaid, beginning at the marked trees thereon, by a direct line to Chiswell's mines in Virginia.

2. Treaty between John Stuart, on behalf of his majesty, the king of England, and the upper and lower Cherokee nations, concluded at Hard Labor, on the 13th October, 1768, establishing the following boundary :—From a place called Towahihie, on the northern bank of Savannah river, a north fifty degrees east course in a straight line to a place called Demesses Corner, or Yellow Water; from Demesses Corner or Yellow Water, a north fifty degrees east course, in a straight line to the southern bank of Reedy river, at a place called Waughoe, or Elm Tree, where the line behind South Carolina terminates ; from a place called Waughoe, or Elm Tree, on the southern bank of Reedy river, a north course in a straight line to a mountain called Tryon mountain, where the great ridge of mountains becomes impervious; from Tryon mountain, in a straight line to Chiswell's mine, on the eastern bank of the Great Conho-

way (Kenhawa) river, about a N. by E. course; and from Chiswell's mine, on the eastern bank of the Great Conhoway, in a straight line, about a north course, to the confluence of the Great Conhoway with the Ohio.

3. Treaty with the Six Nations, concluded at Fort Stanwix, on the 5th of November, 1768, in which the sachems and chiefs assert the ownership of, and by which they sold to King George III., all the land, bounded by the following line :—Beginning at the mouth of the Cherokee, or Hogohege (Tennessee) river, where it empties in the river Ohio, and running from thence upwards along the south side of the said river Ohio, to Kittanning, which is above Fort Pitt; from thence by a direct line to the nearest fork of the west branch of the Susquehanna, &c., &c., &c., and extended eastward from every part of the said line, &c., &c.

4. Instructions from Lord Botetourt to Col. Lewis and Dr. Walker, dated Williamsburg, Dec. 20th, 1768; directing them to proceed to Mr. Stuart, superintendent of the southern district, and represent to him that the line from Chiswell's mine to the mouth of the Great Kenhaway, contracts the limits of the colony too much, and saying that "if Virginia had been consulted upon this line, there would have been an opportunity of showing that the Cherokees had no just title to the lands between the supposed line and the mouth of the Cherokee river, which in fact were claimed, and have been sold to his majesty, by the northern nations at the late treaty at Fort Stanwix."

5. Report of Lewis and Walker, saying that they had met with a portion of the Cherokee chiefs, who would use their influence to obtain a new boundary.

6. A memorial, from the House of Burgesses of Virginia to the governor, praying that a new boundary-line may be adopted, and suggesting one from the western termination of the North Carolina line, in a due west direction to the river Ohio. This memorial was sent to England by the governor, on the 18th December, 1769.

7. An address from the House of Burgesses to the governor, and his answer upon the same subject.

8. Resolution of the House of Burgesses, 16th June, 1770, requesting that a treaty be made with the Cherokees for the lands lying within a line to be run from the place where the North Carolina line terminates, in a due western direction, till it intersects Holstein river, and from thence to the mouth of the Great Kanhawa.

9. Letter from Lord Hillsborough 'to Lord Botetourt, dated at White Hall, State Paper Office, October 3, 1770, saying, I am convinced, from the fullest consideration, that the extension of the boundary-line, as proposed by the address of the House of Burgesses in December last, would never have been consented to by the Cherokees.

10. Treaty with the Cherokees, made at Lochaber, in the province of South Carolina, on the 18th October, 1770, adopting as a boundary a line, beginning where the boundary-line between the province of North Carolina and the Cherokee hunting-grounds terminates, and running thence in a west course to a point six miles east of Long Island, in Holstein's river, and thence in a course to the confluence of the Great Conhaway and Ohio rivers.

11. Letter from Lord Dunmore to the Earl of Hillsborough, dated at Williamsburg, March, 1772, saying that the boundary-line between the colony and the hunting-grounds of the Cherokee Indians had been run by Mr. Donelson and others; but that it had not been run exactly according to instructions, taking in a larger tract of country than by those instructions they had permission to include; that the commissioners had continued, from the point on Holstein river, where it is intersected by the division line of Virginia and North Carolina, down that river a small distance, to a place from whence they had an easier access than anywhere else to be found, to the head of Louisa (or Kentucky) river.

There were also given in evidence, sundry papers from the state department, verified, as copies, by the certificate of Fletcher Webster, Esq., acting secretary of state, the substance of which was as follows :—

1. A protection for the Great Warrior of Chote, dated on the 13th of May, 1771, at Toguch, and signed by Alexander Cameron, deputy superintendent. It states, that he intends to hunt from thence to Long Island and thereabouts, until the arrival of the Virginia commissioners, who are appointed by that government to run the boundary-line; and expresses a hope, that if he should meet with any hunting-parties, they would remove from the lands which were reserved for the Cherokees.

2. A talk from Alexander Cameron, dated at Lochaber, 5th February, 1772, saying to the Indians that he had informed the governor of Virginia that the course of the boundary-line to where they left it on the Cedar river was approved by all the chiefs, and that he had

Porterfield v. Clark.

reminded Colonel Donelson of his promise of sending a few presents to the Long Island, upon Holston, in the spring.

3. A letter from John Stuart to Ouconestotah, great war-chief of the Cherokee nation, saying that he sent him therewith a copy of the boundary agreed upon, and that persons were appointed to mark it immediately.

4. A treaty of cession to his majesty by the Creeks and Cherokee Indians, of certain lands to the south, dated on the 1st of June, 1773, at Augusta; and a talk to the Cherokees dated at Augusta, on the 3d of June, 1773, reminding them that in 1771 they had marked a line, dividing their hunting-grounds from what they gave up to his majesty in the province of Virginia, and which fell in upon the head or source of Louisa (now Kentucky) river, and down the stream thereof to its confluence with the Ohio, and relinquished all claims or pretensions to any lands to the north-eastward of said line; and informing them that his majesty had erected a new province whose boundaries were—beginning on the south side of the river Ohio, opposite the mouth of Sciota, thence, southerly, through the pass in the Anasiota mountains, to the south side of the said mountains; thence along the south side of the said mountains, north-eastwardly to the fork of the Great Kenhawa, made by the junction of Green-briar river and the New river; thence along the Greenbriar river, on the easterly side of the same, unto the head or termination of its north-easterly branch thereof; thence easterly to the Alleghany mountains; thence by various courses to the southern and western boundary-line of Pennsylvania, and along the western boundary-line until it shall strike the Ohio river, and thence down the said river Ohio to the place of beginning.

5. Talk from Lord Dunmore to the Little Carpenter and chiefs of the Cherokee nations of Indians, dated at Williamsburg, on the 23d day of March, 1775, warning them not to grant land to Henderson or any other white people.

6. A letter from William Preston to the chiefs of the Cherokee nation, dated at Fincastle county, on the 12th of April, 1775, saying that he was commanded by Lord Dunmore to send the letter by a special messenger, who was to read it to the council. The letter remonstrates against the sale which they had lately made of that great tract of land on the Ohio, without the advice or consent of the king, and says that, by various treaties, the land had been the property of the king for upwards of thirty years.

7. A letter from Patrick Henry, junior, to Oconostotah, dated on the 3d of March, 1777, assuring the Cherokees of the protection of Virginia, and expressing an expectation that he, and his warriors and head men, will not fail to meet Colonel Christian, Colonel Preston, and Colonel Shelby, at the fort, near the Great Island, to confirm the peace.

8. Articles of peace made at Fort Henry, near the Great Island, on Holston's river, on the 20th July, 1777, between the commissioners from the commonwealth of Virginia, of the one part, and the chiefs of that part of the Cherokee nation called the Overhill Indians, of the other part.

The fifth article recites that, as many white people have settled on lands below the boundary between Virginia and the Cherokees, commonly called Donelson's line, it is necessary to fix and extend a new boundary and purchase the lands within it. The new line begins at the lower corner of Donelson's line on the north side of the river Holston, and runs down that river according to the meanders thereof and bending thereon, including the Great Island, to the mouth of Claud's creek, being the second creek below the warrior's ford at the mouth of Carter's valley; thence running a straight line to a high point on Cumberland mountain, between three and five miles below or westward of the great gap which leads to the settlement of the Kentucky. This last-mentioned line is to be considered as the boundary between Virginia and the Cherokees.

9. A letter from Patrick Henry, dated at Williamsburg, on the 15th November, 1777, to Oucconastotah, saying that his heart and the hearts of all the Virginians are still good towards the Cherokees.

10. A letter from Patrick Henry to the Cherokees, saying that he is informed that the line which was run was not convenient to the Cherokees; that they wanted it to come higher up the river Holston, and that he has given orders to have it altered a few miles, to take in the fording-place into their land.

There was also given in evidence, the deposition of Peter Force, an inhabitant of the city of Washington, who had been for many years engaged in collecting authentic papers connected with the history of the United States, from the settlement of the several colonies, (including Virginia,) to the adoption of the federal constitution, under a contract with the secretary of state, made by authority of an act of Congress. Mr. Force gave it as his opinion, after an examination of books, maps, treaties, and other authentic papers, that the

country between the Tennessee, Ohio, and Mississippi rivers, and the boundary line between what is now the state of Kentucky and Tennessee, belonged to the Cherokees previous to the year 1779; that all the maps which he had found designated the Cherokee country as being north of the Chickasaws, extending westward to the Mississippi and northward to the Ohio; and that in no instance had he found the lands above described to be marked upon any map as belonging to any other tribe of Indians than the Cherokees. Mr. Force annexed to his deposition copies of sundry papers relating to a treaty made in 1730, between the Lords Commissioners for trade and plantations, and the Cherokees,—together with the treaty itself, which was executed in England by some of the chiefs who had gone there.

Exceptions were filed to the deposition of Peter Force, but they were overruled, and at a subsequent stage of the cause these exceptions were withdrawn.

On the 13th of November, 1841, after hearing an argument for three successive days, the Circuit Court dismissed the bill with costs, and the complainant appealed to this court.

Before the cause was argued, the following paper was filed :—

On the question, whether the lands in controversy were regarded as Chickasaw or Cherokee lands, the counsel for the appellants hope they will be at liberty to refer to an original official letter from Governor Thomas Jefferson to Gen. Clark, dated the 29th January, 1780, and now on the files of the Chancery Court at Richmond, in a suit there depending between the administrator of Gen. George Rogers Clark and the commonwealth, for the settlement of their accounts. This letter is wholly upon the subject of the public service, and, amongst other things, upon the subject of erecting a fort near the mouth of the Ohio. It contains the following passages :—

"From the best information I have, I take for granted, that our line will pass below the mouth of Ohio. Our purchases of the Cherokees hitherto, have not extended southward or westward of the *Tanissee.* Of course the little tract of country between the Mississippi, Ohio, *Tanissee*, and Carolina line, on which your fort will be, is still to be purchased from them, before you can begin your work. to effect this, I have written to Major Martin, our Cherokee agent, of which letter I enclose you a copy."—(This extract is from the first page of the letter.)

"I must also refer to you, whether it will be best to build the fo

at the mouth of Ohio, before you begin your campaign, or after you shall have ended it. Perhaps, indeed, the delays of obtaining leave from the Cherokees, or of making a purchase from them, may oblige you to postpone it till the fall."—(This extract is from the sixth page of the letter.)

It is proper to state, that this letter mentions the Chickasaws as a hostile tribe.—See the letter, bottom of p. 4 and top of p. 5.

*Morehead* and *Chapman Johnson*, for the appellants and complainants below.

*Crittenden*, for the defendants.

[The notes of Mr. *Morehead's* argument, as taken by the reporter, not being within his control when this part of the volume was put to press, the argument is necessarily and reluctantly omitted.]

*Crittenden*, for defendant, stated the nature of the two conflicting titles, and then referred to the claim of Porterfield as asserting the superiority of his title, both at law and in equity. If these allegations are true, then the complainant has the legal title and cannot sue in equity. His remedy at law is complete, and this court has no jurisdiction. If the elder patent of Clark be a nullity and void on its face, it would be no bar to an action of ejectment and the recovery of the land. 6 Peters, 666.

But if the original evidence of title exhibited by the parties, be referred to as the proper test of the nature of the case, and of the jurisdiction of a court of equity, then it will appear that the present is nothing more than the ordinary case of a junior patentee, seeking, in the familiar and appropriate mode of a bill in equity, to coerce a surrender and conveyance of the legal title of an elder patentee.

In this view of the case he argued,

1. That the complainant had no such claim as could prevail in a court of equity against the elder legal title of the defendant.

2. That if he had shown such right, then that the defendant's title was prior in time and better in equity.

3. That however perfect the complainant's title, and however imperfect the defendant's, the latter is protected and the former barred by the statute of seven years' limitation.

1. Porterfield asserts a military claim under the reservations made in the Virginia acts of 1779, (1 Litt. 406,) and 1781, (1 Litt. 432,) and in virtue of the entries made on the military warrants, together

with the patents issued in 1825 and 1826 under an act of the Kentucky legislature of 1820. From these sources the complainant derives title, if any he has, and insists,

1. That the acts of the Virginia legislature operate as a legislative grant of the legal title to the troops alluded to in them, and that his locations were required only to discriminate, as between him and his fellow-soldiers, his portion.

2. That his entries, if such were necessary as original appropriations, are valid and good under the said act of 1779.

The act of 1779 required that entries should be made so specially as to enable subsequent locators to locate the adjacent *residuum* with safety. To do this and to make a valid entry, it must so describe the land as to identify it by notorious objects. Decisions without number might be cited to establish this as the settled rule of law in such cases. Speed *v.* Lewis, Hardin, 477; Johnson *v.* Pannel's heirs, 2 Wheat. 206.

Tested by this rule, the entry of the complainant cannot be maintained. There is no evidence, nor attempt to prove the identity or notoriety of the objects on which these entries depend; and this fatal defect is obvious.

Are the acts of Virginia legislative grants? The acts of 1779 and 1781 are acts of reservation, not of grant. They reserved districts of country from other appropriation, that they might therewith satisfy the military claimants. This is manifestly the character of the acts themselves, and though in other and subsequent acts, words and expressions may be found that would give colour to the argument that the lands had been " given," " appropriated," &c., yet these must be understood with a reference to the principal acts, which had not given, but reserved them " to be given or granted," as might thereafter be directed. In confirmation of this, the 11th section of the act of May, 1782, indicates that the portion or bounty-land of each military claimant was thereafter to be granted to him by patent. Revised Code, 395.

But if, by these acts, Virginia had divested herself and granted the title, to whom did she grant the land? Certainly not to Porterfield, so as to enable him, individually, to maintain an action at law or suit in equity. He would almost have as good a right to sue in the character of a citizen of the commonwealth, and in virtue of the right which, as such, he had.

If these acts can, in any sense, be regarded as a grant, out of

which the complainant's title was to spring, such title could only vest in him to any specific parcel, when the legal means for its investiture had been performed. Was that to be done by entry? If so, that entry should be so special as at least to identify, if not to make notorious, the land intended to be selected. The common rule requires notoriety, but if we dispense with that, identity is indispensable. This entry does not identify the land. If the entry is neither required by law, or being required, is inoperative for want of specialty, it confers no right, either legal or equitable. What, then, has the complainant done to make this particular land his property? It is not by survey; for, admitting that would have been a sufficient appropriation under the laws of Virginia, no such survey was made. The only survey made was in 1824–5, long after the date of Clark's patent and under a law of Kentucky, which authorized surveys to be made upon entries only, and required those surveys to conform to the entry. According to that law, the survey was not recognised as an act of appropriation, but only as a means of perfecting and carrying into grant such entries as were valid by their special description of the land. So that, in any way in which it can be viewed, the right of the complainant must resolve itself into the validity and specialty of his entry.

If it were admitted that a survey was a sufficient appropriation, the survey must contain such a description as would identify the land by the corresponding objects proved to have existed on the land. Up to the time, therefore, of the separation of Kentucky, the complainant had no title derivable from any location or survey; and he must rest for any such title upon the acts of the Virginia Assembly alone. They gave him no individual right to the specific land in question; they gave him no right in it. If any, it must be what the complainant contends it is, viz., a perfect legal title. And if so, his bill in chancery cannot be maintained. That these acts granted no such right *per se*, is necessarily implied in the decisions of the Kentucky Court of Appeals in the cases of Jasper, &c. *v.* Quarles, Hardin, 464, and McIlhenney's heirs *v.* Biggerstaff, 3 Litt. 155. For if such rights had been granted, neither Jasper nor Biggerstaff could have succeeded in equity against the title granted before the claims originated.

Upon general principles, courts of chancery will not, except in favour of an equity clearly made out, disturb the holder of the legal title, however, or by whatever means, obtained; and this is the

settled doctrine of the courts in Kentucky in reference to cases like the present, of conflicting land claims. Hardin's Reports, 103, 112, 469; 2 Bibb, 168; Ward, &c. *v.* Lee, 1 Bibb, 33, 229; Garnet *v.* Jenkins, 8 Peters, 75.

The Virginia acts in question bear no resemblance to the acts referred to in the case of Green's heirs, 2 Wheat. 196; here are no words of present donation or grant, no individual appropriation. These acts were not so understood by either Virginia or Kentucky, as is shown by their compact, 1 Litt. Laws of Kentucky, p. 19, sect. 10, and by the subsequent acts of Kentucky in disposing of those lands as her own, and by the act for surveying the military claims.

In 1779, Virginia only reserved these lands "until her further order." The Kentucky decision in Rollins *v.* Clark, 8 Dana, 19, expressly repudiates the idea of a legislative grant, and the cases of Bledsoe's heirs *v.* Wells, 4 Bibb, 329, and McIlhenney's heirs *v.* Biggerstaff, 3 Litt. 161, do so by necessary implication. In the case of Wilcox *v.* Jackson, 14 Peters, 516, it is said that where lands are granted by act of Congress, it must be done "by words of present grant." Virginia thought that something more would be necessary, because she included these military warrants within the act opening a land-office, the 11th section of which (Rev. Code, 395, act of 1782) requires the officers to receive paper-money for fees for issuing grants on military warrants. It is brought in, incidentally, it is true, but nevertheless explains the meaning of prior laws.

Having thus examined the title of Porterfield, and the time when it accrued, let us look at the second head of the argument.

2. That Clark's title is prior in time and better in equity. His final amended entry was made on the 26th October, 1780, in virtue of Virginia Treasury warrants; was surveyed, as to 36,962 acres, on the 7th June, 1784, and patented under the Kentucky act of 1794, on the 15th of September, 1795. The entry calls to "begin on the Ohio river, at the mouth of the Tennessee," &c. In its terms, it contains all the precision and certainty required by the act of 1779, and is a good and valid entry. It includes the land in controversy, as does also the survey and patent founded upon it. The only grounds on which the claim is attempted to be impeached are two,

1. That it is within the military reserve.

2. That it is within the country and limits of the Cherokees.

As to the first, it is sufficient to say that the entry of Clark was made prior to the military reservation; and the acts of reservation

could never have been intended to deprive or affect the existing lawful rights of prior locations; (see case of Grundy, 2 Wheat. 203;) whatever may have been the title transferred by these acts in the unappropriated lands of the reserved district. And all this, as well as the lawfulness and validity of Clark's entry was solemnly adjudged by the Virginia Court of Appeals, as early as the year 1793, in the case of Marshall, &c., superintendents of the Virginia State Line v. George Rogers Clark, Hughes' Reports, 39.

That decision settled every question as to the lawfulness and validity of the entry in question, except only whether it was within the "Cherokee country or limits;" and this court ascribed such effect to that decision in the case of Clark's heirs v. Smith, 13 Peters, 195.

Supposing Clark's entry to be within the Cherokee country, his entry and survey might have been void, but his patent would not. It was granted in obedience to the express provisions of the Kentucky act of 1794, and after the *caveat* of the superintendents to prevent it had been dismissed. 8 Dana, 15. In that case, the Court of Appeals of Kentucky say that, upon the fact supposed, the patent would not be void; it would confer the legal title on the patentee. The case of Bledsoe's devisees v. Wells, 4 Bibb, 329, is in principle to the same effect. Such patents convey the legal title, and the party in possession of it, by whatever means acquired, can only be disturbed by one holding a clear equity. Rucker v. Howard, 2 Bibb, 165; Hardin, 103, 112; Ward, &c. v. Lee, 1 Bibb, 33, 229; Hardin, 15, 105, 469; 8 Peters, 75.

But was Clark's entry within the "Cherokee country and limits?" It is incumbent upon the complainant to prove that it was, and he has not done it. The Cherokee settlements were far remote on the head waters of the Tennessee.

The Natchez and Chickasaw tribes lived directly west of them, and between them and the Mississippi and much nearer the mouth of the Tennessee river.

The ancient maps produced are no evidence, and are admissible by no rule of law that I know of. If they were admissible, they prove nothing but the ignorance of their authors, and destroy each other by their contradictoriness; and if they do not thus destroy each other, they do not show that the Cherokees claimed or owned the lands below the mouth of the Tennessee river.

The testimony of Mr. Force and the royal authentication of

those maps may prove that they are true copies, but they cannot convert fables into facts, or prove that the originals were correct.

It is insisted upon by the other side, that this was the Cherokee country alluded to and intended by the legislature, because, as they attempt to show, all the other lands of the Cherokees within the limits of Virginia had been before ceded to her.    If the facts justified such a conclusion, then, as all these cessions were matters of treaty and history, the court should have taken judicial notice of them and decided differently the case in Hughes, 39.    Exclusive of such lawful grounds of judgment, there is no more evidence in this, than in that case, that the country in question belonged to the Cherokees.

There is nothing more excusable than ignorance, even in the Virginia legislature, of the "limits of the Cherokee country:" the limits of roving bands of savages who had no occupancy but of their huts, and were sparingly dotted about in that great western region.

No treaty made with the Indians ever did recognise the lands in question as Cherokee lands.    Such a construction of any of the treaties made with those Indians, would have entitled the superintendents to a judgment in the case in Hughes, 39.    No treaty prior to 1779, did more than settle their eastern boundary by a line of division between them and the whites.

The first agreement or settlement of their western boundary was in 1785, by the treaty of Hopewell, which was by a line from the Cumberland to the Tennessee river, forty miles above Nashville, leaving out and at a great distance the lands in question.

And by a treaty with the Chicasaws in 1786, these lands were recognised as theirs, or "assigned to them for their hunting grounds."

But the great fact from which the complainant draws all his arguments, namely, that the Cherokees had not, in 1779, any other lands but those below the mouth of the Tennessee, is not true.    From their western line, striking the Cumberland forty miles above Nashville, they did own the lands on that river, and between that and the line dividing North Carolina from Virginia, and they owned lands between that river and the Cumberland mountains; all of which were finally purchased from them by the treaty of Tellico, in 1805, and becoming thereby the property of the state of Kentucky, were disposed of by her.    See the treaties of 1791, 1798, and 1805, recognising and purchasing these lands as Cherokee lands, in vol. of Indian treaties, 34, 80, 121, and Statute Law of Kentucky, 2 vol. page 921, 1009.

To pronounce this to be Cherokee land upon the construction of any treaty, or upon historical evidence, would be to contradict the judicial decisions of Virginia and Kentucky. Hughes, 39 ; 8 Dana, 15. The deposition of General Jackson contributes strongly to prove that it was not Cherokee land ; and a further proof that it was not is found in the recitals of the deed from the Cherokees to Henderson and Company, in which they declare the Tennessee river to be their boundary, and claim nothing below or westward of its mouth.

If this was not Cherokee country, the basis fails of all the arguments designed to establish the nullity of Clark's patent.

But suppose it was Cherokee country, is Clark's patent therefore void?

The distinction in the Kentucky courts is this : If no cause of invalidity appear on the face of the patent, it is conclusive at law, and no evidence of any extrinsic fact is admissible to invalidate it. Bledsoe's heirs v. Wells, 4 Bibb, 329 ; 4 Monroe, 51 ; 5 Monroe, 213 ; 1 Munf. 134 ; but that such evidence is admissible when the statute which forbids the appropriation declares, also, that the patent shall be void.

3. However perfect the complainant's title, and imperfect the defendant's, the latter is protected and the former barred by the statute of seven years' limitation.

It has been shown that the patent is not void upon its face, that it was sanctioned by the Kentucky act of 1794, and that it has been recognised by judicial decisions in 8 Dana, 15, and 13 Peters, 195. That this is sufficient to admit the operation of the statute, was decided in 2 Marshall, 387, Skiles's heirs v. King's heirs.

The statute requires that he should have a "connected title in law or equity, deducible of record from the commonwealth." The original defendants are connected by regular derivation of title, with the original title of Clark, and his is deduced from the commonwealth by all the appointed evidences of title, viz. : an entry, survey, and patent, all of record. The case is thus brought as to title, as well as possession and settlement, within the plain meaning of the statute. See in addition to the authority just cited, White v. Bates, 7 J. J. Marshall, 542 ; Gaines, &c. v. Buford, 1 Dana, 481 ; and 6 J. J. Marshall, 452. According to the decision of the court in Skiles's heirs, 2 Marshall, 387, the statute was intended to help and protect "invalid titles," to protect settlers under patents which in fact passed no title either in law or equity, being for land granted

before the origin of the settlers' claim; that the words of the statute, "a connected title in law or equity, deducible of record from the commonwealth," "does and must mean such title when tested by its own face, and not tried by the title of others." The test is, would it be good against the commonwealth, "supposing no other to exist on the ground."

Tried by these rules, can there be a doubt that the claim of the defendants is within the protection of the statute?

But all this is attempted to be evaded upon the ground that the claim was within the Cherokee country, and therefore void. The fact of its being within the Cherokee limits has been already noticed; and the consequence does not follow, that, if so, it is void and beyond the reach of the statute. Bledsoe's devisees *v.* Wells, 4 Bibb, 329; Rollins *v.* Clark, 8 Dana, 15; Ray *v.* Baker's heirs, 1 Ben Monroe, 364; Gray *v.* Gray, 2 Ben Monroe, 200; Jennings *v.* Whitaker, 4 Monroe, 51; Pearson *v.* Baker, 4 Dana, 322; Cain *v.* Flynn, 4 Dana, 501; Finley *v.* Williams, 9 Cranch, 164; Boulden and wife *v.* Massie, 7 Wheat. 122; Stringer *v.* Lessee of Young, 3 Peters, 337; Bagnell *v.* Broderick, 13 Peters, 436.

If this party is to be deprived of the benefit of the statute, because an adversary claimant can show that his title originated in a forbidden and unlawful entry, or other act of appropriation, it must equally apply to all settlers under junior titles, and a claimant, showing his elder and better appropriation, annuls the junior title and sweeps away with it the statute of limitations. Because, as all our laws confirmed the holders of warrants or certificates, &c., to waste and unappropriated lands, they violated the law in locating lands that were appropriated, and their entries, surveys, and patents must therefore be void. Why not apply the same reasoning to surveys and patents founded on entries void for uncertainty and vagueness on their face? The statutes require and command that they shall be special and certain in their description.

If this reasoning prevails, the statute of limitations is in effect repealed, or left in existence in reference alone to cases which do not require its assistance.

*Chapman Johnson,* for appellants, examined the three following points:

1. Whether, upon the merits, the plaintiff or defendants have the better right.

2. Whether the case is proper for the jurisdiction of a court of equity.

3. Whether the plaintiff's claim is barred by the statute of limitations.

1. He drew a distinction between Treasury warrants and military warrants, as resting upon different grounds, although the law must govern the interpretation of both; but the military warrants are of a higher order. The title of the complainant is perfect, unless it be overruled by an elder or better one. In examining Clark's title, he passed by, for the moment, the question whether the survey was made by the proper surveyor or conformed to the entry; but inquired whether the land taken up was " waste and unappropriated land." But first it would be necessary to disembarrass the case of the allegation that it had been already settled by judicial decisions. The present plaintiffs were not parties to any prior case. The first was in 4 Call. 268, where the question arose whether the reserved lands were subject to entry or not. It went up to the Court of Appeals for their opinion, who said that, whether the land was Cherokee land or not, was a question of fact depending upon proof; and said also that he who affirmed it would have the burden of proof upon him. It is admitted that where there is a general law with exceptions, he who wishes to bring himself within the exception must show it. It is also true that the act of 1781 could not divest Clark of any title which had vested in him. The legislature of Virginia could not effect it under the constitution of the state.

In the case of Rawlins *v.* Clarke, 8 Dana, 15, by the compact between Virginia and Kentucky, the Virginia law was the guide, and the decision is nothing more than the opinion of a state court upon general law, which may be decided in different ways in different states. The Kentucky court was in the same situation as the Virginia court, and had no further evidence of the fact of this being Cherokee country. The latter decision is entitled to less weight, because the preceding decision in Virginia was looked to as authority, and the attention of the court was drawn chiefly to the question of fact. In the case in 13 Peters, the construction of the resolutions of Virginia was not argued, and the state of facts before the court now is not the same as it was then. The court cannot *ex officio* take notice of treaties which are not read and have never been published. This court once and again followed the courts of Tennessee in deciding a question of local law; but on the third time, they reversed

their opinion, because the courts of Tennessee had done so too. There is now, as then, a different state of information before the court. If Virginia ever put Indian land into the market before the title was extinguished, it was not done designedly, but ignorantly and by construction. This court has said so in the case of Johnson *v.* McIntosh, and ought now to relieve Virginia from the imputation.

What is the true construction of the act of 1779 upon this point? Before the Revolution, Great Britain stood in the light of a protector for the Indians against the intrusion of the whites, claiming that no title should be acquired from them except by purchase; but as long as the title was unextinguished, the Indians were protected in the possession according to their own mode of enjoyment. The right only was claimed to transfer the occupancy when the title should be purchased. It now appears that the title to the land in controversy had not been extinguished in 1779. At that time we had, by the treaties of Hard Labor and Lochaber extinguished all title to land except to that west and south of the ridge which divides the Cumberland from the Tennessee. It must be remembered also that Virginia thought she had Indian land within her limits. Up to 1779, the Chickasaws had never been recognised by the diplomacy of Virginia, who thought all the Indian land was Cherokee. There was a claim presented from 1775 to 1778, respecting Henderson's purchase, and committees were appointed every year, who reported that a compensation should be given for his expenses and a law passed giving him about 250,000 acres. In the same year, 1778, a resolution was passed appropriating land to military claimants, covering Henderson's grant, but excepting it, together with the rights of settlers. The whole of the residue was allotted to soldiers. In 1776, the county of Kentucky had been established. Henderson disclaimed all legal title and put his claim on the ground of a reasonable appropriation. This was the state of things in 1779, when the law passed; but it did not pass alone. It was preceded by an act to establish a land-office. As early as 1776, a joint resolution was passed complaining of the difficulty of land-titles and making provision to meet it. Virginia intended to sell only the lands that were marketable, but none west of the Tennessee. In 1781, when a change was made, and that land superseded the land which had fallen into North Carolina, there was no saving whatever of any rights. Did she believe there were any legal rights then? If so, she would have saved them. She afterwards asserted her authority

I 2

over the Indian lands, but only claimed a pre-emptive right. In 1784, when the governor was authorized to suspend proceedings, she did not think there were any Treasury warrants located there, because military aid was promised to remove incumbents.

What then is the construction of the act of 1779?

It does not put into the market any land to which the Indian title was not extinguished. Although she might have sold the land, subject to the Indian title, there must be strong proof of it, because good faith to the Indians required her not to do it. Where is the law authorizing it? Where are the words in the act? There are none there to justify it. It would be a violent interpretation to make her do the same thing with both kinds of lands. For her own lands she asked forty pounds in depreciated paper per hundred acres. Was the same price asked for a reversion only? But the letter of the law tells us what kind of land was meant, not waste lands only, but unappropriated lands. Can such be called so, to which the Indian title had not been extinguished. She only claimed a reversion, and in the mean time it was solemnly appropriated to the Indians, by every guard by which she could do it. It was inaccessible to whites; the public faith was pledged to protect it for an indefinite period of time. Was not this appropriated? and is the question decided by the court of Virginia or Kentucky, or was it before them? How can they be unappropriated? Is it said that Virginia violated her faith by pledging these lands to the soldiers, and authorizing them to take the lands. She never meant to relinquish her right of eminent domain, and suppose that, for self-preservation, she agreed to give them to the soldiers, would it follow that she also intended to sell them for money? The motives in the two cases are entirely different. But if we say that she intended only to pledge the land to the soldiers, subject to the Indian title, it is not the spirit of her legislation, for all the lands between Tennessee and Green River were free from Indian title, and she offered that or a claim to the reservation in the Indian land. The boon, therefore, was immediate. There is no evidence that she intended to force the Indian land upon the soldiers; but permitted them to wait, if they chose, or take the other lands. There is nothing unjust to the soldier or to the Indian in this. When the Indians objected to the survey, instead of enforcing her right, Virginia suspended her proceedings. Why did not Virginia reserve all Indian lands instead of Cherokee lands? Because the terms are synonymous. There were

no Indians there except Cherokees.   From 1729 to 1779 she had made all her treaties, and established boundaries with Cherokees. Where are any with Chickasaws?   She thought then that she excepted the whole Indian land.   It is said that mentioning Cherokees implies that more were there.   There were no Indians on this side of the Blue Ridge.   They excepted all the Indian country they knew of.   If they had thought their allies, the Chickasaws, had not been protected, would they not have done it?   Can any construction be sustained, which would seize upon friendly Indians' lands, and protect those of a hostile tribe?   If you believe that she never intended to open the Chickasaw lands, can you say that she did it ignorantly?   The great rule of all contracts, from the most humble parol one to treaties, is the intent of the parties.   Look at the injustice and inconsistency which would be charged to Virginia.   But suppose I am wrong in all this, and the Cherokees were alone excepted; commissioners were appointed at that or the previous session, by Virginia, to purchase this very land.   What was the object of Virginia? to protect the Cherokees as such? for their personal benefit? or to describe a tract of country to be free from Treasury warrant?   Suppose Virginia was mistaken, and it turned out to be Chickasaw country?   Was not the intention clear? to reserve this land?   A mistake in the description would not vitiate the act. Calling the country by a wrong name would not destroy the reservation.   The whole analogy of law is against it.   A devise would not fail if you can find a person answering the description, although the name be wrong.   If the Cherokees had no land there, we must find out the true persons intended to be protected.   An interpretation must be adopted which will further and fulfil the spirit of the act. If it can be shown that these lands were not intended to be protected, the cause will be surrendered.   They were never intended to be put into the market.   It would not be fair to do so to the purchaser, to say nothing of the Indian.

Suppose I am wrong in all this, and the exception is not in favour of the country but personal, can it not be shown to have belonged to the Cherokees?   Our argument was not to prove actual *alibi*, but where Virginia supposed the Cherokees to live.   Virginia had made four or five land-offices, and it is proved what they did not mean to protect, and there would have been no necessity for protecting the Cherokees, unless they had supposed them to live on the west side of the Tennessee river.   Between the Green and Tennessee the

country was thrown open. What then did they mean to protect? What was not included within the military reservation was not north or east of the Tennessee. It must have been west and south of it. The argument goes to show the intention of the legislature.

But to the point whether this was not actually Cherokee country. In examining this fact, what sort of evidence will be required? Is it the evidence of a law, or treaty with the United States? Must we show only *prima facie* evidence? or produce a treaty with the United States? The question is one of *meum* and *tuum.* Is the treaty of Hopewell conclusive? The establishment of the boundary will decide whether Porterfield or Clark is the owner of this property, and this is a judicial question. The question of boundary may be a political question generally, and courts cannot decide between sovereign powers, but they are bound to decide a question of property. Neither the executive nor legislature can act upon it. If a law were passed giving the property to Porterfield, I would think it an insult to the court to offer it here. If this were a question between the Cherokees and the United States, it might be doubtful how far it could be considered. But if the treaty had not settled the point, and abstained from doing so, the court would then take it up, as they did in Arredondo's case.

The case in 11 Peters, 186, was correctly decided, because where two sovereign powers agree as to their boundaries, it declares that their jurisdictions come up to the line and bind the citizens of each. But if a claim to property had been made in the part transferred, would the court say that the right to the soil had also passed with the change of jurisdiction? In case of cession, rights would be adjudged by the laws which prevailed before it took place, and it is only the jurisdiction and sovereignty which passes over. But in this case, there is no question of sovereignty involved. The treaty of Hopewell never intended to settle questions of property. All it intended was to fix the boundary as to the jurisdiction of the parties. The same remarks apply to the case in 14 Peters. North Carolina, in 1783, marked out a line, and in 1784, extended it towards the Indians, giving the surveyors power to open offices, and protecting the Indians as to the rest, and it was doubted whether the act of 1784 did not repeal the protection of 1783.

The title arose between 1794 and 1797 when the line was run, and it was necessary to inquire at what time the line was adopted. The question of title depended upon the fact whether the property

was in the Indian territory or not; and this could be settled only by the contracting parties. But that case is not analogous to this. The question is not whether or not Virginia had a right to legislate over it, or a political question at all. The Chickasaws or Cherokees have no interest at all in it.

From 1729 to 1779 the Cherokees were recognised as owning land in the west, but the Chickasaws were not. In 1763, the proclamation of the king prohibited any person from acquiring land west of the mountains, and this had not been changed by Virginia, but recognised in 1776. Chap. 1, page 350 of Revised Code.

George Walton and others say in their petition that the proclamation prevented them from completing their title. Journal of the House of Delegates of Virginia, for 1778, pages 64, 97.

Treaties had been made with the Cherokees at Hard Labor, Lochaber, Fort Stanwix. Henderson had purchased up to the ridge which divides the Tennessee from the Cumberland. The purchase was assumed by Virginia and Henderson compensated. Inquiry was made of the chiefs as to the nature of the purchase, and commissioners appointed to take testimony. For these proceedings see journal of May, 1777, pages 44, 49, 56, 65, 70, 20, 41, 48, 136; and May, 1778, pages 30, 36, 70, and Nov. 1778, pages 79, 91.

As soon as the act passed for Henderson, the resolution was passed appropriating lands for the soldiers. In the act there is a reference to the proclamation of 1763; in the act of 1779 for settling titles, no claims are recognised in opposition to the proclamation, all others are.

What was in fact the Cherokee country in 1779?

The treaty of Hopewell does not touch this point. It intended to act for the future and not for the past. The lines described in two clauses do not touch each other but leave a gap. It would have been impossible to trace the line between the Cherokees and Chickasaws by a surveyor, for it would depend upon the fact where they lived; and they might have had joint occupancy. No one ever treated with the Chickasaws until 1785.

But is there nothing to show that this was Cherokee country in 1779?

There is the evidence of Mr. Force, a disinterested witness, an ex parte: He produces fourteen maps from 1755 to 1778, made by French and English authority, which put the Chickasaws south of latitude 35, and the Cherokees north of them. The river Tennessee is called in these old maps the river of the Cherokees, and they are placed

as far west as the Mississippi. By the treaty of Fort Stanwix the Tennessee river is the south boundary of the Six Nations, and the Cherokees are over it.

The Cherokees were recognised as owners by Virginia in 1769, because she wanted to purchase from them all north of 36.30, to extend the boundary with North Carolina to the Mississippi. (See address of the House of Delegates.) Lord Hillsborough replied that the Cherokees would not consent to it. So, at Lochaber, in 1770, they were recognised as being within the limits of the province of Virginia, because she treated with them and assigned to them the west side of the line therein described, to the whole extent of Virginia. So in the letter of Lord Dunmore in 1772. In the articles of peace between Virginia and the Cherokees in 1777, a line is agreed upon, and no white man is to go below the said boundary. Virginia could not have intended that this land should be taken up in 1779.

What is Porterfield's title?

[Mr. *Johnson* here went into a minute examination of it, and traced its history.]

But it is said that we are barred by the statute of limitation. This statute is intended to protect him who can trace a title from the commonwealth, and is a special law. There is another and general act of limitations, and where this is the case the special law must be construed strictly. Clark's title cannot be tried, as is alleged, by itself, because a part of the grant has been sold, as appears from the record, and it is nowhere shown what part. The title professes to be from a land-office Treasury warrant, and upon land south of the Tennessee; it is, therefore, void upon its face, and not within the fair construction of the act, the third section of which says it shall not apply to cases of conflicting titles. The preamble of the law shows it was intended to apply only to a particular class of cases and not those within the military district.

Mr. Justice CATRON delivered the opinion of the court.

For the principal facts, we refer to the statement of the reporter.

The first question in order presented by the bill depends on the validity of the complainant's title. But as that of the defendants is the elder, and Clark's entries not objected to on the ground that they are void for want of specialty; and the survey and patent founded on them being in conformity to the locations, we will at once proceed

to the main question presented by the bill; that is, whether Clark's entries were made in the Cherokee country or limits, and therefore void for this reason as against Porterfield's subsequent entries: The first being on Treasury warrants, and the last on military warrants. The act of 1779, by virtue of which Clark's entries were made, excepted the Cherokee lands from location; and if the land in dispute, (in October, 1780,) was such, then Clark's entries are void, if not, they are valid; and this fact being found either way, will end the controversy. We are called on to find the fact; and as it has been agitated in regard to this title, for nearly sixty years, uncommon care has been bestowed on the question, and a second argument been ordered.

The defendant's title came before this court in Clark *v.* Smith, 13 Peters, 200, when the entries of Clark were pronounced special; and the survey and patent declared to conform to the entries: And in which case it was also held, that it was immaterial whether the entry was made on the lands claimed by the Chickasaws or not; it could only be obnoxious to the provisions of the statute of 1779, if made on lands reserved from location by that act; and the lands of the Chickasaws were not thus reserved. So it had been decided by the Court of Appeals of Virginia in Marshall and others *v.* George R. Clark in 1791, Hughes's R. 40, and which was affirmed in Rollirs *v.* Clark, by the Court of Appeals of Kentucky, in 1839, 8 Dana's Rep. 26.

The reservation is, "No entry or location of land, shall be admitted within the country and limits of the Cherokee Indians." The bill alleges the entry of Clark to be within the excepted lands.

The first inquiry we will make is, how far the contest stands affected by former decisions, made by the Court of Appeals of Virginia, by this court, and by the Court of Appeals of Kentucky.

As to patents made by Kentucky, on warrants issued by that state after the Chickasaw title was extinguished, for lands west of Tennessee river, the case of Clark *v.* Smith as an adjudication is direct to the point, that Clark's patent is superior to such titles. This may be true, and yet Clark's entry be void; as Kentucky, in 1794, "not only authorized, but made it the imperative duty of the register to issue a patent on the certificate of survey; as he seems to have done in obedience to the act. We cannot admit that a patent thus issued pursuant to the authority, and mandate of the law, can be deemed void, merely because the entry of the patentee was invalid." We

use the language of the Court of Appeals of Kentucky, in the case of Rollins *v.* Clark, 8 Dana, 28.

If Clark's entry was made, however, on lands reserved from location by the act of 1779, then it is void, because the act did not open the land-office for such purpose, nor extend to the excepted lands: and whether the exception reserving the Cherokee country, included the lands west of Tennessee river, was in 1779, and is now, a matter of fact, as already stated, for the court to ascertain. This fact is not concluded by the case of Clark *v.* Smith, although materially influenced by it. That adjudication, so far as this question was involved in it, is founded mainly on the case of Thomas Marshall, George Mater, and others, superintendents of the Virginia state line, *v.* George Rogers Clark, Hughes's Rep. 39, in a suit by *caveat*, to restrain Clark from obtaining a patent on the survey founded on his entries; two entries having been included in it. The cause was tried before the Court of Appeals of Virginia in 1791, on the *caveat*, filed in 1786. The first fact agreed by the parties, and submitted to the court, was whether the locations of Clark could be made west of the Tennessee river, on Treasury warrants; or, in other words, whether that country was reserved from location, as being the country and limits of the Cherokee Indians. The court held, " the solution of the question to depend on a matter of fact to be decided on evidence; and none such appearing, or being supplied by any law, charter, or treaty, produced or suggested, which ascertained what the country or limits of the Cherokees was in 1779, no solution of the question could be given, except that it was the opinion of the court, that the party whose interest it was to extend the exception to the land in dispute, must prove the land to be within the description of that exception." All the other questions were also decided against the caveators, and the *caveat* ordered to be dismissed. The judgment in effect ordered that a patent should issue to Clark on his survey; and, in fact, adjudged the better right to be in him. A suit by *caveat* was the ordinary mode of trying titles in Virginia, before a patent issued, and was equally conclusive on the parties, as if it had been by bill in equity; this is the settled doctrine of Kentucky, and also Tennessee; and must be so from the nature of the suit. The power and jurisdiction of the courts to try titles in this manner, are conferred by statute, which are very similar in the states named; the practice as to the mode of proceeding, and the effect of the judgment being the same in each. For evidence of this, we refer to the many

cases reported by Hughes; and to the cases of Peck *v.* Eddington, 2 Tennessee Rep. 331 ; Bugg *v.* Norris, 4 Yerg. R. 326, and Peeler and Campbell *v.* Norris, 4 Yerg. 331. " The powers of the courts, (it is said in Bugg *v.* Norris,) will be found co-extensive with any conflicting rights two claimants may have, where the defendant is attempting to perfect his entry into a grant by survey." Each party had the privilege in the case of the superintendents against Clarke to submit such facts as were material to sustain his right; if not agreed, an issue could be asked, and a jury empannelled, to find on the contested facts. They were all agreed. On these the court pronounced on the law of the case, and determined who had the better claim to the land, and awarded to him the patent.

The plaintiff or defendant may introduce more or less evidence to sustain his claim; but if he fail, he cannot be heard to say, in a second suit, his principal evidence of title was not introduced in the first, and therefore he will try the same issue again in another form of proceeding on different and better evidence. 4 Yerg. 337–8; Outram *v.* Morewood, 3 East's R. 357.

The patent being awarded to Clark, it was adjudged that he should take the land in fee; and the whole legal estate and seisin of the commonwealth in the lands. Had the judgment been, that no patent issue to George Rogers Clarke, then he would have been estopped to controvert the superior right of the superintendents : If he would have been estopped, so were the superintendents, on the judgment being the other way. 4 Yerg. 333. Estoppels are mutual. 4 Com. D. Estoppel, B. They run with the land, into whose hands soever the land comes; by which the parties and all claiming under them, as well as the courts are bound ; were it otherwise, litigation would be endless. Such is the established rule. Trevinan *v.* Lawrence, 1 Salk. 276, reported also by Lord Raymond.

The superintendents were therefore estopped by the judgment of the Court of Appeals of Virginia from averring that Clark's entry lay within the Cherokee country : and how was Porterfield affected by that judgment?

By the act of Nov. 1787, opening the military lands to location ; those west of Tennessee river inclusive, the officers were authorized to appoint so many of their number superintendents as they might deem proper to locate (after selections by survey had been made) all the claims of the officers and soldiers. For this purpose they were given authority to select the lands and distribute them among

**K**

the claimants according to their respective ranks. The act of Dec. 1782, makes more distinct, and further provision, and gives increased power to the superintendents. The entire country reserved to the uses of the military claimants was surrendered to the possession of the superintendents, as trustees, from which they might select any lands, to comply with the purposes of the trust; as such trustees in possession, they had the right to file the *caveat* against Clark, after they had selected the. land, or any part of it, (located by him,) for the use of the officers and soldiers. When selected and surveyed, then the surveys were to be drawn for and allotted as chance might determine; after which, the party thus entitled was authorized to enter of record by an ordinary location, the number he drew in the lottery. Porterfield drew the lands set forth in the bill; to protect his entries the *caveat* was filed, as well as to protect others set forth in the record adjoining Porterfield's; and also to maintain the general right of all the claimants entitled exclusively to locate in the reserved lands.

As Clark would have been estopped to deny the right of the superintendents, (had they been successful,) to appropriate the land in dispute, it is difficult to say, that Porterfield, for whose benefit especially the *caveat* suit was prosecuted by those acting for his use, is not also estopped, on the principle of mutuality. It is hardly possible to separate the right of those acting as trustees, from that of the *cestui que trust:* still, as the proceedings and judgment in the suit by *caveat* are not set up as a defence in any manner, we can only look to them as furnishing cogent reasons that it could not be proved, during the time the *caveat* was pending that the lands west of the Tennessee river were part of the Cherokee country, in 1779.

In the case of Clark *v.* Smith, no evidence was produced to the court, other than that furnished by the treaties with the Cherokees and Chickasaws; together with the history of the country; and which were existing and open to the Court of Appeals of Virginia in 1791; except the treaties made since that time; and these we thought had no material influence on the question; and therefore on the evidence then before us, it was declared, that Clark's title was not open to controversy on the ground (then, as now) assumed, that the land when located lay within the country of the Cherokee Indians.

Does the record before us and the other matters adduced, furnish. additional evidence to change the result of that conclusion? As it does not appear in the cases referred to, what the existing treaties,

Porterfield *v.* Clark.

contracts, and intercourse with the Cherokees had been in 1791, a reference will be made to them, so far as they may affect this controversy. During the British colonial government of Virginia, by different treaties, previous to 1777, the eastern limits of the Cherokees commenced six miles above the Long Island in Holston river, (now in the county of Sullivan, Tennessee,) from thence to Cumberland gap; then to the head of the Kentucky river, and down the same to the Ohio. This line ran down the Cumberland mountain from Holston river to the gap, and included in part the great road from Virginia to Kentucky passing through Cumberland gap. The citizens of Virginia settled on the road, and west of the line; irritation on part of the Cherokees was the consequence. In July, 1777, the Long Island treaty was made, at Fort Henry, standing at the island. By that treaty the Indian line was removed further west; commencing six miles above the island, and running with the river to the mouth of Cloud's creek; being the second creek below Rogersville, in Hawking county, Tennessee, and a few miles below that place; thence to a high point of Cumberland mountain a few miles below the gap; here the line stops, and it was the only one between Virginia and the Cherokees existing in 1779, (when the land law was passed,) except the boundaries established by the grant to Richard Henderson and Company, dated in March, 1776; the extent and effect of which, will be presently seen. As the treaty of 1777 has a most important bearing on the facts hereafter stated, its material parts are given.

"Article 3d. That no white man shall be suffered to reside in or pass through the Overhill farms without a proper certificate, signed by three magistrates in the county of Washington, in Virginia, or in the county of Wataugo, in North Carolina, to be produced to, and approved by the agents at Chota. Any person failing or neglecting to comply herewith, is to be apprehended by the Cherokees and delivered to the said agent, who they are to assist in conducting to the commanding officer at Fort Henry; and the said Cherokees may apply to their own use all the effects such persons may be in possession of at the time they are taken in the nation. And should any runaway negroes get into the Overhill farms, the Cherokees are to secure them until the agent can give notice to the owner, who, on receiving them are to pay such a reward as the agent may judge reasonable.

"Article 4th. That all white men residing in or passing through the Overhill country, properly authorized or certified as aforesaid,

are to be protected in their persons and property, and to be at liberty to remove in safety when they desire it. If any white man shall murder an Indian, he shall be delivered up to a magistrate in Washington county, to be tried and put to death according to the laws of the state. And if any Indian shall murder a white man, the said Indian shall be put to death by the Cherokees, in the presence of the agent at Chota, or two magistrates in the county of Washington.

"Article 5th. That as many white people have settled on lands below the boundary between Virginia and the Cherokees, commonly called Donelson's line, which lands they have respectively claimed in the course of this treaty, and which makes it necessary to fix and extend a new boundary, and to make a just and equitable purchase of the lands contained therein, it is therefore agreed by and between the said commissioners in behalf of the commonwealth of Virginia, of the one part, and the subscribing chiefs in behalf of the said Cherokees, on the other part, in free and open treaty without restraint, fear, reserve or compulsion of either party, that a boundary-line between the people of Virginia and the Cherokees be established, and the lands within the same be sold and made over to the said commonwealth; which line is to begin at the lower corner of Donelson's line on the north side of the river Holston, and to run thence down that river according to the meanders thereof, and binding thereon, including the great island to the mouth of Claud's creek, being the second creek below the warrior's ford at the mouth of Carter's valley; thence running a straight line to a high point on Cumberland mountain, between three and five miles below or westward of the great gap which leads to the settlement of the Kentucky.

"This last mentioned line is to be considered as the boundary between Virginia and the Cherokees. And all the lands between the said line and that run by Col. Donelson, and between the said river and Cumberland mountain, as low as the new boundary, is to be the present purchase.

"For which tract of land, or so much thereof as may be within the limits of Virginia when the boundary between the states of Virginia and North Carolina is extended, the said commissioners agree, in behalf of the commonwealth, to give to the said Cherokees two hundred cows and one hundred sheep, to be delivered at the great island when the said line shall be run from the river to Cumberland mountain, to which the said Cherokees promised to send deputies

and twenty young men, on due notice of the time being given them.

"And for and in consideration of the said stocks of cattle and sheep, the said chiefs do, for themselves and their nation, sell, make over, and convey to the said commonwealth, all the lands contained within the above described boundary, and do hereby for ever quit and relinquish all right, title, claim or interest in and to the said lands or any part thereof; and they agree, that the same may be held, enjoyed and occupied by the purchasers, and, that they have a just right, and are fully able to sell and convey the said lands in as full, clear, and ample a manner as any lands can possibly be, or ever have been sold, made over or conveyed by any Indians whatever.

"Article 6th. And to prevent as far as possible any cause or pretence, on either side, to break and infringe on the peace so happily established between Virginia and the Cherokees, it is agreed by the commissioners aforesaid and Indian chiefs, that no white man on any pretence whatsoever shall build, plant, improve, settle, hunt, or drive any stock below the said boundary, on pain of being drove off by the Indians, and his property of every kind being taken from him. But all persons who are or may hereafter settle above the said line, are quietly and peaceably to reside thereon without being molested, disturbed or hindered, by any Cherokee Indian or Indians; and should the stocks of those who settle near above the line, range over the same into the Indian land, they are not to be claimed by any Indians, nor the owner, or any persons for him, be prevented from hunting them, provided such person do not carry a gun ; otherwise the gun and stock are both forfeited to the Indians, or any other person who on due proof can make it appear. Nor is any Indian to hunt or to carry a gun within the said purchase, without license first obtained from two justices; nor to travel from any of the towns over the hills, to any part within the said boundary, without a pass from the agent. This article shall be in full force until a proper law is made to prevent encroachment on the Indian lands, and no longer."

This treaty fully explains why the Cherokee country was excepted from the land-law of 1779, and locations on it prohibited ; no reasons could add force to its stipulations.

In November, 1785, the next treaty was made at Hopewell with the Cherokees by the United States, and a new boundary was

established, beginning at the mouth of Duck river on the Tennessee; thence north-east, to the Ridge dividing the waters running into Cumberland river, and the Tennessee; thence eastwardly along said ridge to a point from which a north-east line would strike Cumberland river forty miles above Nashville. The first corner from the beginning on the ridge is about one hundred miles from the mouth of Tennessee river.

In January, 1786, the same commissioners who treated with the Cherokees, also made a treaty at Hopewell with the Chickasaws: beginning at the Cherokee corner on the ridge, dividing the waters of the Cumberland and Tennessee rivers, and running westerly with said ridge to the Ohio river, and then down the same.

All lands west of this line were guarantied to the Chickasaws. The treaty was not one of cession on part of these Indians; but the establishment of existing boundaries: the one from the Cherokee corner, to the Ohio, being the only line, dividing territory claimed by the United States, to which the Indian title had been extinguished contained in the treaty, our inquiries need extend no further for the purposes of the present controversy. That it was deemed the ancient boundary of the Chickasaws, by themselves, will appear hereafter: as it will also appear, that the Cherokees in no instance, so far as our researches have extended, asserted to the contrary; but that they admitted the fact, on different occasions in a manner free from exception; and which admissions were well calculated to remove any doubt on this point.

That the lands west of the line on the ridge belonged to the Chickasaws, and not to the Cherokees in 1779, is rendered almost certain by the deed the Cherokees made to Richard Henderson, Thomas Hart, Nathaniel Hart, John Williams, John Luttrell, Wm. Johnston, James Hogg, David Hart, and Leonard Hendly Bullock, on the 17th day of March, 1775. The first part of the deed recites "That the Cherokee nation, or tribe of Indians, being the aborigines and sole owners by occupancy from the beginning of time of the lands, on the waters of the Ohio river, from the mouth of the Tennessee river, up the said Ohio, to the mouth of the Great Canaway, or New River, and so across by a southward line to the Virginia line, by a direction that shall strike or hit Holston river six English miles above, or eastward of the Long Island therein; and other territories and lands thereunto adjoining;" do grant, by Oconestoto, chief warrior, and first representative of the Cherokee nation, (acting

with other warriors named,) on part of said nation to Richard Henderson and the others, part of said lands, for the sum and consideration of ten thousand pounds lawful money of Great Britain, to said Cherokee nation in hand paid; the receipt of which is acknowledged for and on behalf of the nation, by the warriors making the treaty; the lands granted lying on the Ohio river; beginning on the said river Ohio, at the mouth of the Kentucky, Chenoca, or what by the English is called Louisa river; from thence running up the said river and the most northwardly branch of the same to the head spring thereof; thence a southeast course to the top ridge of Powel's mountain; thence westwardly along the ridge of said mountain unto a point from which a north-west course will hit, or strike, the head spring of the most southwardly branch of the Cumberland river; thence down the said river, including all its waters, to the Ohio river; thence up the said river as it meanders to the beginning.

Various covenants are contained in the deed, and among others, that the grantees, their heirs and assigns, shall and may from time to time, and at all times thereafter peaceably and quietly, have, hold, occupy, possess, and enjoy the premises granted without the trouble, let, hinderance, molestion, or interruption of the Cherokee nation or any one claiming under the Cherokees. And Joseph Martin and John Farrer were appointed by the grantors, to put the grantees in possession.

They did take the possession, and founded "The colony of Transylvania," on their grant; and on the 23d day of May, 1775, the first legislative assembly of said colony was held therein, and regulations adopted for the future government of the same. Col. Richard Henderson, acting for himself and the other proprietors, communicated with the Assembly, by an address delivered to it; the proprietors exhibited their deed to the soil of Transylvania from the aborigines: Col. Henderson, in person, and John Farrer, as attorney in fact for the Cherokees, attended the convention, when Farrer, in the name of the head warriors, chiefs, and Cherokee Indians, in presence of the convention, made livery and cession, of all the lands in the deed of feoffment above recited; which deed was there again produced. A copy of it, and of the proceedings, appear in Butler's History of Kentucky, 566. The same deed is set forth in Haywood's History of Tennessee.

This deed and the proceedings under it make up the most prominent historical transaction in the early history of Kentucky; and it

has been relied on by both sides without objection. And as a historical fact, it was quite as prominent in Virginia in 1791, when the *caveat* suit was decided; and also in 1779 when the first land-law under consideration was passed. By the act of October, 1778, c. 3, and the resolution of the convention that formed the first constitution of Virginia in 1776, 2 Rev. Code, 350, 353, and the reservation for Henderson and Co. of 200,000 acres at the mouth of Green river, this manifestly appears. The land reserved to Henderson and Co. is declared in full compensation to them and their heirs for the consideration paid to the Cherokees, and for the expense and trouble in acquiring the country and aiding in its settlement.

The act of October, 1778, c. 3, recites, "Whereas it appears to the General Assembly that Richard Henderson and Company have been at very great expenses, in making a purchase of the Cherokee Indians; and although the same has been declared void, yet as this commonwealth is likely to receive great advantage therefrom, by increasing its inhabitants, and establishing barriers against the Indians, it is therefore just and reasonable the said Richard Henderson and Company be made a compensation for their trouble and expense:" and by the second section the land at the mouth of Green river is granted as the compensation proposed.

The act of May, 1779, c. 6, declares that the commonwealth has the exclusive right of pre-emption from the Indians of all lands within the limits of its territory, as described in the constitution of government in the year 1776; that no person had a right to purchase any lands from any Indian nation within the commonwealth, except persons duly authorized on public account for the use and benefit of the commonwealth

That every purchase of lands made by or on behalf of the crown of Great Britain from any Indian nation in the before-mentioned limits, doth and ought to enure for ever to and for the use and benefit of this commonwealth, and that all sales and deeds which have been made by any Indian or Indians; or by any Indian nation for lands within said limits, for the separate use of any person, or persons, whatsoever shall be, and the same are hereby declared utterly void and of no effect.

The construction of the acts of 1778 and 1779, has been that the deed to Henderson and Company was void, as against the commonwealth; but valid as against the Cherokees, and therefore the title to the lands conveyed passed to the commonwealth. This assumption has

been maintained from the time the convention sat in May, 1776; as the resolutions of the convention show: And it received the sanction of the United States at the treaty of Hopewell with the Cherokees in 1785.   The Indians disavowed it, when the treaty commenced.   On the 22d of November, before the Chickasaws had arrived at the treaty-ground, the commissioners called on the Cherokees for their boundary; the Indians postponed it.   On the 24th, they were again called on, and then said, give them a pencil and paper, and leave them to themselves, and they would draw a map of their country. November 26, the map, and a description of the boundary claimed was presented to the commissioners by Tassel, who spoke on behalf of the Indians.   It began on the Ohio above the mouth of the Kentucky river; ran to the Cumberland river where the Kentucky road crossed it; thence to the Chimney-top mountain in North Carolina, and southward.

Tassel said, on presenting the map: "I know Richard Henderson says he purchased the lands of Kentucky and as far south as the Cumberland, but he is a rogue and a liar, and if he was here I would tell him so.   He requested us to let him have a little land on Kentucky river for his cattle and horses to feed on, and we consented, but told him at the same time he would be much exposed to the depredations of the northern Indians, which he appeared not to regard, provided we gave him our consent.   If Attacullaculla signed his deed, we are not informed of it; but we know Oconestoto did not, and yet his name is to it; Henderson put it there, and he is a rogue."

To which the commissioners replied: "You know Colonel Henderson, Attacullaculla, and Oconestoto are all dead; what you say may be true; but here is one of Henderson's deeds, which points out the line, as you have done, nearly till it strikes Cumberland, thence it runs down the waters of the same to the Ohio, thence up said river as it meanders to the beginning.   Your memory may fail you; this is on record, and will remain for ever.   The parties being dead, and so much time elapsed since the date of the deed, and the country being settled, on the faith of the deed, puts it out of our power to do any thing respecting it, you must therefore be content with it, as if you had actually sold it, and proceed to point out your claim exclusive of this land."

Tassel answered: I know they are dead, and I am sorry for it, and suppose it is now too late to recover it.   If Henderson were living I

should have the pleasure of telling him he was a liar; but you told us to give you our bounds, and therefore we marked the line; but we will begin at Cumberland, and say nothing more about Kentucky, although it is justly ours."

On the 2d of December, 1785, the commissioners reported to the secretary at war amongst other things, "That in establishing the boundary, (with the Cherokees,) which is the chief cause of complaint with the Indians, we were desirous of accommodating the southern states and their western citizens, in any thing consistent with the duty we owed to the United States.

"We established the line from forty miles above Nashville on the Cumberland, agreeable to the deed of sale to Richard Henderson and Co. as far as the Kentucky ford; thence to the mountain six miles south of Nollchuckey, agreeable to the treaty in 1777, &c., with Virginia, and North Carolina." The latter treaty is that of Long Island, above set out.

The sale to Henderson and Company, therefore stands on the same grounds as if it had been made by the authority of the crown of Great Britain, so far as boundary and Indian rights stand affected.

Its southern line from the top of Powell's mountain ran westwardly on the top of the mountain, to a point from which a north-west course would strike the head spring of the most southwardly branch of Cumberland river, thence down said river, including all its waters, to the Ohio river; thence up that river. The most southwardly branch of the Cumberland, is the south fork running into the Cumberland about 170 miles above Nashville. At Hopewell, the Cumberland river was treated as the southern boundary referred to, by the deed to Henderson and Company: this, however, may have been inaccurate; the top of the ridge dividing the waters of the Tennessee and Cumberland rivers was the western boundary claimed by the Cherokees; and it is not probable that they intended to retain the narrow strip of land between the top of the ridge and the Cumberland river. That this ridge was the true western boundary before 1779, appears from the following facts:—

When the map was furnished at Hopewell, the sale to Henderson was disregarded and the original western boundary given, "from the beginning of time," within the expression used in the deed to Henderson and Co. It was returned to the war-office of the United States, a copy of which is found, and was produced on behalf of the complainant, in the American State Papers, (vol. i. page 40,) pub-

lished by the authority of Congress, edited by the secretary of the Senate and clerk of the House of Representatives, and published in 1832. On this map the Cherokees laid down their western limits, beginning at the mouth of Duck river, then to the ridge between the Cumberland and Tennessee rivers; then down said ridge to the Ohio, and up the same. At the treaty, Tassel, on behalf of the Cherokees, said—"We will mark a line for the white people; we will begin at the ridge between the Tennessee and Cumberland, on the Ohio, and run along the same, till we get round the white people as you think proper. We will mark a line from the mouth of Duck river to the said line, and leave the remainder of the lands to the south and west of the lines to the Chickasaws." And according to this the Chickasaw limits to the east were recognised by the parties to the Cherokee treaty, in the absence of the Chickasaws. 1 State Papers, 43.

In January, 1786, the Chickasaws made their appearance at the treaty-ground at Hopewell. They agreed on the lines, from the mouth of Duck river to the ridge, and then with it to the Ohio, as the boundary between themselves and the whites, (1 State Papers, 57;) and to which, the treaty made with them, on the 10th of January, 1786, corresponded. It does not appear any of the Cherokees were present.

In August, 1792, Wm. Blount, governor of the south-western territory, and superintendent of Indian affairs, for the southern district, and General Pickens, met the Chickasaws, Choctaws, and Cherokees, represented by chiefs, at Nashville, by order of the United States, for the purpose of securing friendly relations with these tribes. Every Chickasaw chief was there except three. John Thompson, interpreter, and two chiefs attended on part of the Cherokees. 1 State Papers, 284. General Pickens had been one of the commissioners on part of the United States at Hopewell; and Gov. Blount the agent at said treaty for North Carolina, and a witness to it. Piomingo for the Chickasaws handed a letter from President Washington, which he had received by Mr. Doughty, and a map of the country made at Hopewell, showing the line established by the treaty; the map being opened and explained, Wolf's friend said the line between the Chickasaw and the United States was right. The map being worn and old, a copy was made, and furnished to the Indians.

Piomingo then said,—"I will describe the boundaries of our land; it begins on the Ohio, at the ridge which divides the waters of Tennessee and Cumberland, and extends with that ridge, eastwardly as

far as the most eastern waters of Elk river; then south, &c., crossing the Tennessee river at the Chickasaw old field." This is opposite the heads of Elk.

Piomingo then addressed the Cherokees, and said: "At the treaty of Holston, (1791,) I am told the Cherokees claimed all Duck river. I want to know if it is so?"

Nontuaka, for the Cherokees, replied: "It is true. I told the President so, and coming from him, told my nation so. I never knew before the present, that our people divided land and made lines like the white people."

Piomingo replied: "I am the man who laid off the boundary on that map; and to save my own land, I made it plain: I know the fondness of the Cherokees to sell land." Nontuaka replied: "As to the boundary I do not look at it. The President advised us to let one line serve for the four nations; he would never ask for any more land south of it, nor suffer others; and all the hunting-ground within said boundary should be for the four nations."

To this the Chickasaw chief replied: "By marking my boundary, I did not mean to exclude other nations from the benefit of hunting on my lands. I knew the Cherokees had often pretended to take the whites by the hand, but instead of doing it in good faith, they are always sharpening their knives against them. I feared the whites, in retaliation, would fall on the Cherokees, and they might take my land, supposing it belonged to the Cherokees: for this reason I have marked it." The Chickasaws then promised to furnish the Cherokees with a copy of their map; and this was afterwards done.

John Thompson then said: "We, (the Cherokees,) do not find fault with the line between the white people and the Chickasaws, nor with the place where the Chickasaw's line crosses the Tennessee; but I have not before been so fully informed of the claim of the Chickasaws." 1 State Papers, 286.

In regard to the line on the ridge, from the Cherokee corner north, to the Ohio, in our opinion, it may be safely affirmed, that so far as the contracts, treaties, and admissions of the Cherokees furnish evidence as part of the history of the country, the lands west of that line belonged to the Chickasaws in 1779, when the Virginia land-law was passed; and that this is confirmed in a remarkable degree, by the treaty of Hopewell with the Chickasaws, and the intercourse had with them respecting that line, then, and afterwards.

That Virginia so understood it, can hardly be doubted. In the

winter of 1779–80, Walker's line was run, establishing the boundary between Virginia and North Carolina; it was marked to the Tennessee river, and the latitude of 36.30 north taken on the Mississippi river: the history of it will be seen in the case of Fleeger v. Pool, 11 Peters, 185. This led to the discovery that the southern boundary of Virginia ran much further north than she had apprehended. The officers and soldiers had had assigned to their exclusive appropriation the lands south of Green river acquired by the deed of Henderson and Company; a great portion of the best part supposed to belong to Virginia before Walker's line was run, having fallen south of that line, the act of 1781, after reciting the fact, declared: that all that tract of land included within the rivers Mississippi, Ohio, Tennessee, and the Carolina boundary-line, shall be and the same is hereby substituted in lieu of such lands so fallen into the said state of North Carolina, to be claimed in the same manner by the officers and soldiers as the lands south of Green river: and the act prescribes the mode of locating them. By virtue of this law Porterfield's entries were made. Four years before the act of 1781 was passed, the Long Island treaty of 1777, had been made with the Cherokees by Virginia; it was in full force in 1781, when the military claimants were let in to locate on the country. When we consider the strong terms of protection imposed on Virginia by the treaty; the integrity and elevation of character of its people; the danger of resentment on part of the Indians; and it is hardly possible to believe that so gross an infraction of the treaty was intended, as the appropriation of the country in question necessarily involved.

With the Chickasaws, at that day, Virginia had not had any intercourse; these lands lay far off from the residence of the Chickasaws, and were mere hunting-grounds. Virginia might not have known, and we suppose did not know to any degree of certainty, that they belonged to this tribe, or what Indians claimed them, either in 1779 or 1781. But we repeat: one thing is certain, that Virginia treated the lands as subject to appropriation in 1781; which she could not have done without forfeiting her honour, and breaking her treaty, had they been Cherokee lands; and we feel great confidence she intended to do neither. The treaty of 1777, was equally in force in 1781, as in 1779.

The opinion of the Court of Appeals in 1791, is conclusive to the point—that if the land in dispute was not Cherokee country, it was not within the exception of the land-law of 1779; and that Clark's

title is good, as all the lands in the commonwealth not excepted, were subject to appropriation on Treasury warrants, although claimed by Indians whose lands were not protected from location by statute.

It is next insisted, that as there was no other country in Virginia belonging to any tribe of Indians in the west, the reservation must have referred to that west of Tennessee river. However imposing this argument may seem, it is easily explained, when we recollect that in 1779 it was unknown where the southern boundary of Virginia was. The question is, what limits did she assume as hers at that time? The Long Island treaty-line of 1777, ran down the Holston to the mouth of Cloud's creek, and then to a point below Cumberland gap. Up to these boundaries the Virginians had settled; and west of it they were prohibited from going; the country for half a degree south of Walker's line was in the possession of Virginia; she had Fort Henry there, and governed it. Lands were located and enjoyed under her laws south of Walker's line, east of the line running from the mouth of Cloud's creek to the mountain; and had the Cherokee country west of the line not been excepted from location, her people would have broken the treaty and obtruded on the Cherokees After the deed of Henderson and Company had been treated as a valid cession to the state, this was the only definite and established line left between the parties; and the protection of which, excited great anxiety on part of the Indians, as plainly appears by the treaty; it is therefore manifest, the exception in the land-law had reference mainly to this line, in support of the treaty as the standing law between the parties to it.

The argument is founded on the fact, that the entire line from the Holston, to Cumberland gap, fell to North Carolina; as Walker's line runs through the gap, and north of the high point at which the line terminates; but for the reasons stated, it proves nothing, when explained by the mistake under which Virginia laboured in regard to her southern boundary, before Walker's line was run. Had the legislature declared no location should be made west of the Cherokee line; then there would be no difficulty in saying what line was meant; as there was then no recognised Cherokee line in the assumed limits of Virginia but the one from Holston river to the mountain. It is therefore almost as certain this was the line alluded to in the exception of the act of 1779, as if the legislature had said so.

To prove that the Cherokees did own the country west of Tennessee river near its mouth, the deposition of Peter Force is intro-

duced on part of the complainant.  The witness expresses it as his opinion that the land in dispute in 1779 belonged to the Cherokees: This opinion is founded on books, maps, treaties, and other papers, in his possession, and supposed by him to be authentic, which for many years he had been collecting as connected with the history of the United States, from the settlement of the colonies to the adoption of the federal constitution; pursuant to a contract made in 1833 with the secretary of state, under the authority of an act of Congress for the publication of these papers.  A portion of them are given; and among the number different maps of the country west of the Allephany mountains, including the country on the rivers Ohio, Tennessee, and Mississippi, from about the thirty-fourth degree to about the thirty-eighth of north latitude.

Most of these maps have statements on them that the country west of Tennessee river was Cherokee land—" country of the Cherokees," &c., being marked on the maps.  They were published at different periods previous to the Revolution; the most respectable of them, that of Mitchell, in 1755.  The physical geography of the country was obviously little understood, as the maps are very imperfect, and no authority for this purpose at the present day, where any degree of accuracy is required.  The only documentary evidence produced by Mr. Force to show the residence of the Cherokees is found in the report in the proceedings to the British government, of Sir Alexander Cuming, who visited the Cherokees in the spring of 1730, obtained their submission to the crown, and took to England some of their chiefs, to ratify a treaty there with the lords commissioners of trade and plantations.  This treaty describes no boundaries, but is one of amity, and contains stipulations that the Cherokees in future shall be subject to the sovereignty of the British crown.  Sir Alexander visited the Indian towns on the Keowee where the treaty of Hopewell was made, and went north to Tellico where the king Moytoy resided, and got his submission, and the surrender of his crown.  This town Tellico was near the Tennessee river, where it first takes the name; and is in what is now Monroe county, Tennessee, more than 300 miles from the land in dispute.  It continued to be an Indian town until the treaty of 1819, when the Cherokees extinguished their title to the country there.

In January, 1793, Governor Blount, the superintendent of Indian affairs in a letter to the secretary of war, gives an account of the places of residence of the Cherokees at the beginning, and previous

to the Revolution. He says they lived in towns either on the head waters of the Savannah river, (Keowee and Tugelo,) or on the Tennessee above the mouth of Holston. He then proceeds to prove that the lands sold to Henderson and Company did not belong to the Cherokees; and also, that the lands formerly sold by them to Henderson and Company, lying on the Cumberland, belonged to the Chickasaws, that the Cherokees had only sold their right to them as a common hunting-ground, and that Virginia had previously purchased them from the northern Indians. And if he is not mistaken, in his representation of the facts and admissions of the Cherokees, stated in his letters of November, 1792, and January, 1793, he does prove, that to the lands sold to Henderson and Company, north of Cumberland river, the Cherokees had no title when they made the deed; and that they so admitted; and that the lands ceded by them south of that river by the treaty of Hopewell belonged to the Chickasaws; or at least that this tribe had a better founded claim to them than the Cherokees. Copies of the letters are found in the State Papers, vol. i. pp. 325, 431.

We think that not much reliance can be placed on any thing contained in Mr. Force's deposition: And that the conclusion Governor Blount formed, is contrary to what Virginia admitted by the treaties of Hard Labor, and Lochaber, and by taking title under the deed of Henderson and Company: this deed is in conformity to the foregoing British treaties made with the Cherokees previous to the Revolution, and especially that of 1770, of Lochaber; according to which, the eastern Cherokee line in Virginia was established from a point six miles above the Long Island in Holston; thence through Cumberland gap, to the head of Kentucky river, and down the same to the Ohio. Virginia never set up any assumptions to the contrary of this being the true line as run by Col. Donelson; by whose name it was known. Nor could the United States be heard to disavow the Cherokee title recognised by the treaty of Hopewell to the lands lying south of Cumberland river, and recognised as theirs by that treaty.

And in this connection, we take occasion to say, nothing short of the clearest proof, would induce this court, after the lapse of nearly sixty years, to hold otherwise, than that the Chickasaw line, established by the treaty of Hopewell, from the Cherokee corner, to the Ohio river, was conclusive, that it was the true line of that people, anterior to any date, known to Virginia as a commonwealth. As to

the United States it was assuredly conclusive; the treaty not being one of cession: And as to the Cherokees, acquiescence from 1785 to 1819, when the United States acquired the Chickasaw title, it ought to conclude them, unless their superior title was plainly and conclusively proved; and the delay in not asserting it accounted for in a satisfactory manner: The same proof is required of the complainant; in which we think he has altogether failed.

The defendants proved themselves to have been more than seven years in possession under Clark's patent before the suit was brought, and therefore rely on the statute of limitations of Kentucky as a defence.

The statute in terms bars suits in equity as well as actions at law where seven years adverse possession has been held. This court pronounced it no violation of the compact between Virginia and Kentucky in the case of Hawkins v. Barney, 5 Peters, 458. And so Kentucky has often held. It applies to suits where the plaintiff claims under a patent, survey, or entry, against an adverse title set up under another patent, survey, or entry. The defendant's title must be connected, and deducible of record from the commonwealth; which means a connected title when tested by its own derivation. On this the bar may be founded, although it be the younger, and void, when contrasted with the plaintiff's elder patent. Skyles v. King, 2 Alex. Marshall's R. 387. But the statute does not bar a legislative grant, 3 Monroe's R. 161, and it is insisted for the complainant the acts of Virginia vested in the officers and soldiers an equitable title; which was anterior to Porterfield's entries and patents, and independent of them on which the bill can be sustained, and therefore no bar can be interposed. The rule in this court is settled, that each state has the right to construe its own statutes; and especially those baring titles. In the case of Green v. Neal, 6 Peters, 291, it was held that this court uniformly adopted the decisions of the state tribunals, respectively in constructing their statutes; that this was done as a matter of principle, in all cases where the decisions of the state court has become a rule of property. This rule was adopted in Harpending v. The Dutch Church, and has been in many other cases, 16 Peters, 439, and cannot be departed from. The land-laws of Virginia are just as much the laws of Kentucky, as they were the laws of Virginia in that country before the separation. By the decisions of the Court of Appeals of Kentucky it is settled, and has not been open to question for many years, that an entry was required to

L 2

give title on a military warrant in the military district; and that all the specialty, &c., to give it validity, was imposed on the enterer, as if it had been made on a Treasury warrant; each being governed by the provisions of the act of 1779. McIlhenney *v.* Biggerstaff, 3 Littel's R. 161. This form was pursued by Porterfield, and was the only means by which he could acquire an individual title that could be enforced in a court of justice; although he had a common interest in the lands pledged for the satisfaction of his claim, that could be made available through the medium of the land-office. His claim, as set forth in the bill, was, therefore, subject to be barred: By the proof it is barred; and for this reason also the bill must be dismissed.

As it was urged on part of the complainant with much earnestness that the act of 1809, was never intended to apply to the land in dispute, then covered by the Chickasaw title, and protected by the treaty of Hopewell, it is deemed proper to express briefly our opinion on the ground assumed. George R. Clark had mortgaged the land long before the treaty of 1819 was made; therefore it was subject to sale before the Indian title to occupancy was extinguished: so the *caveat* suit was decided first in Virginia in 1791, and ultimately in Kentucky in 1793, after the treaty of Hopewell, therefore the title could be litigated. In 1795, a patent issued to Clark pursuant to a statute of Kentucky of the previous year, general in its terms: It follows the land-laws extended to the country, so far as the inhibitions of the treaty would permit, or the patent could not have issued.

Kentucky legislated for her entire territory, subject to the restrictions imposed by the treaty; which that state recognised as the paramount law until its restrictions were removed by the treaty of cession; when the act of 1809, and all the other laws of Kentucky had effect west of Tennessee river, and operated alike in all parts of the state.

For the foregoing reasons the decree of the Circuit Court dismissing the bill, is ordered to be affirmed.

#### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Kentucky, and was argued by counsel. On consideration whereof, It is now here ordered and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby affirmed, with costs.