## EDUCATIONAL INSTITUTIONS MAINTAINED BY ENDOWMENTS AND TAXATION.

[Circuit Court of Lucas County.]

STATE, EX REL ATTORNEY-GENERAL, v. CITY OF TOLEDO.

Decided, February 1, 1902.

*Municipal Corporations—May Receive Property in Trust—Restrictions upon Trusts for Educational Purposes—Trustees under Section 4099 not a Corporation—Conveyance of Trust Property to City— Aid by Tax Levy not Unconstitutional—Broad Meaning of the Words "Arts and Trades"—Quo Warranto—Parties—Jurisdiction.*

1. An act of incorporation for the purpose of carrying out a trust is subordinate and subsidiary to the trust, and where the gift is for the establishment of an institution of learning, the purpose and object of the donor must govern; the Legislature has no power to change the trust; that can only be done by some act of those who have power over it.

2. Although such power is not expressly conferred, a municipality has authority to receive property in trust for educational and other purposes beneficial to its inhabitants.

3. Section 4105, as amended (94 O. L., 241), extending the provisions of Sections 4095 to 4104 to cities of the grade of Toledo, is not unconstitutional on the ground of special legislation nor for want of corporate power on the part of the municipality to receive and execute the trust.

4. A board of trustees appointed under Section 4099 and 4105 is not a corporation, but a legal board vested with certain powers; and the conveyance to the city of the trust property for the purposes for which it was originally dedicated does not deprive such trustees of the power vested in them under the original donation.

5. An institution founded for the purpose of promoting a knowledge of the arts and trades is within the line of that purpose when its curriculum of study qualifies those desiring to become artizans or artificers for the work they expect to do, and if this purpose is being accomplished it is immaterial whether the institution be called a university or a polytechnic school.

6. The fact that an institution, founded by private donation, receives money derived from a levy made by the board of education does not take the school out of the class known as private schools, nor is the levy of taxes as an aid in the support of such a school unconstitutional.

7. *Quo warranto* does not lie to prevent a board from exercising an excess of power; the remedy against such action is injunction, and the offending trustees are necessary parties.

HAYNES, J. (orally); PARKER, J., and HULL, J., concur.

In this case a petition in the nature of an information in *quo warranto* has been filed in the name of the state, by the attorney-general, against the city of Toledo, setting forth at great and proper length the history of what is called the University of Toledo, and at the conclusion prays "for the advice of this court in the premises, and that the defendant be compelled to answer to the state of Ohio by what purport it claims to have, use and enjoy the liberty, privilege and franchises of conducting a university in the city of Toledo, and of devoting the proceeds of the several trusts herein set forth, and of the funds derived from taxation to such purpose, and that the defendant be ousted and excluded from any and all authority to conduct and maintain said Toledo University under and in pursuance of the several acts and sections of the Revised Statutes of Ohio hereinbefore set forth, and that the said defendant be compelled to answer to the state of Ohio by what purport it claims to have, use and enjoy the liberty and franchises of conducting the so-called polytechnic school as a department of the said Toledo University, with the curriculum herein set forth, and of devoting the proceeds of the said respective trusts, and of the levies hereinbefore mentioned, upon the property, real and personal, in the said city of Toledo for the said purpose; that the said defendant be ousted and excluded from any and all authority to use said fund, or any portion thereof, whether the same be derived from said trust, or from the proceeds of said taxation for the purpose of operating, maintaining and conducting said polytechnic school with said curriculum."

Counsel for the relator have, with commendable industry, set forth at length the various deeds, acts of incorporation, and statutes under which the present so-called university is conducted. A demurrer has been interposed by the city of Toledo to the petition, which raises substantially all the questions, I think, that can be raised in regard to the matters in controversy.

We realize the importance of the questions involved to the institution and to the city of Toledo, and we have endeavored to give to them a very full, careful, and thorough examination. I shall not be able, however, to review at any very great length the various authorities cited, or, perhaps, the various questions that have been raised. I shall content myself with stating as briefly as possible the points upon which we think the case turns, and cite a very few authorities upon those points. I shall necessarily be rather long. It may tire your patience, but there are so many matters involved it is impossible to state them clearly unless at some length.

The petition sets forth that the defendant "has heretofore misused and abused, and is now misusing and abusing, its franchises, privileges and rights conferred upon it by law, and claims to have, hold and exercise franchises, rights and privileges in contravention of law, as hereinafter more thoroughly and completely set forth. That on October 12, 1872, there was incorporated under the general laws of state of Ohio a corporation known as the Toledo University of Arts and Trades, the incorporators thereof being Jesup W. Scott, Frank J. Scott, William H. Raymond, Sarah R. L. Williams, Charles W. Hill, and Albert E. Macomber. That under said articles of incorporation there was then and there created for the purpose of receiving and executing certain trusts hereinafter mentioned and described, the following trustees: William H. Scott, Frank J. Scott, Maurice A. Scott, Richard Mott, Sarah R. L. Williams, William H. Raymond, Albert E. Macomber, Charles W. Hill; and the following ex officio members, to-wit, the superintendent of the public schools of Toledo, the mayor of the city of Toledo, and the governor of the state of Ohio."

It states that the third paragraphs of the articles of incorporation declared that the fund to accept the trust for which this corporation has been formed consists of 160 acres of land (describing it), the same being valued at $80,000, and being the gift of Jesup W. Scott; also such other funds or property as from time to time be given or acquired for the purpose of this trust. The sole object of said incorporation and of the trust set forth in the fourth of said articles of incorporation is as follows, to-wit:

"The object of this trust is to establish an institution for the promotion of knowledge in the arts and trades and their related sciences by means of lectures and schools; by extensive collections of models and representative works of art; by geological and mineralogical or other cabinets and museums that relate to the mechanic arts, and whatever else will serve to furnish artists and artisans with the best facilities for a high culture in their professions; also to furnish instruction in the use of phonographic characters and to aid their introduction into more general use."

Then follows this paragraph, to which I call attention, because we may have to refer to it hereafter:

"Other branches of learning not included in the above specifications may become a part of the institution when endowed so as to be sustained without the use of the trust funds hereinafter provided. All the advantages offered by this institution are to be free of cost to all pupils who have not the means to pay for the same, and all others are to pay such tuition and other fees as the trustee may require. The institution shall be open to pupils of both sexes alike."

These articles were duly executed and recorded upon October 22, 1872. Seven days thereafter Jesup W. Scott and Susan Scott, his wife, executed and delivered to the trustees a certain conveyance, as follows, the material part, after giving a description of the lands conveyed, being the following:

"This conveyance is made to the said trustees in trust for the following objects and purposes, and subject to the following conditions, to-wit: To establish an institution for the promotion of knowledge in the arts and trades and the related sciences, by means of lectures and oral instruction; of models and representative works of art; of cabinets of minerals; of museum instructive of the mechanical arts; and of whatever else may serve to furnish artists and artisans with the best facilities for a high culture in their respectve occupations, in addition to what are furnished the public schools of the city; also to furnish instruction in the use of phonographic characters and to aid their introduction into more general use, by writing and printing, and also to encourage health-giving, invigorating recreations. All the advantages of the institution shall be free of cost to all pupils who have not the means to pay, and all others are to pay such tuition and other fees and

charges as the trustees may require, and be open alike to pupils of both sexes. All incomes from leases of lands herein conveyed shall, after paying necessary charges and improvements, be expended by said trustees to accomplish the objects herein stated.''

Then it provides for platting and dividing the lands, and for renting the same.

The allegation of the petition follows ''that said conveyance was made solely and only for the purpose as set forth therein, as follows, to-wit;'' and repeats the declarations in regard to the parts that I have already read. The deed was duly recorded.

Afterwards, to-wit, on November 19, 1872, said Jesup W. Scott and Susan Scott, his wife, duly executed and delivered to the said trustees a conveyance referring to said conveyance of October 21, 1872, in the following words—and here follows the statement of the deed:

''Whereas, in our deed of trust to found the Toledo University of Arts and Trades, bearing date October 21, 1872. * * * We have limited the employment of income to furnish facilities for technical education in addition to those furnished by the public schools. * * * Now we do hereby qualify said limitation so that these funds may be used in conjunction with and as a part of any educational fund for the promotion of the kind of education embraced in the deed of trust which may hereafter be furnished by state or city, or by the general government of the United States, subject to such conditions and agreements as the trustees of the university and the authorities having the disbursement of the fund may unite in making.''

Note this: ''We * * * hereby qualify said limitation so that these funds may be used in conjunction with and as a part of any educational fund for the promotion of the kind of education embraced in the deed of trust which may hereafter be furnished by state or city, or by the general government of the United States,'' etc. And the allegation of the petition is that this deed ''was made for the purpose as therein set forth, of modifying the conditions by the following words,'' being the words I have read.

''That shortly subsequent thereto William H. Raymond gave in trust to said University of Arts and Trades, for the purpose

of carrying out the trust in accordance with the aforesaid articles of incorporation, the sum of $15,000. That afterwards, to-wit, on the 5th day of February, 1874, Susan W. Scott, widow of said Jesup W. Scott, William H. Scott, Frank J. Scott, and Maurice A. Scott, heirs at law of said Jesup W. Scott executed and delivered their certain warranty deed, whereby they conveyed certain property to the said trustees of the University of Arts and Trades, in words and figures as follows:''

This was a warranty deed without any qualifications.

''That on April 1, 1873, Albert E. Macomber and wife conveyed certain real estate in said conveyance contained to said trustees of the University of Arts and Trades in a duly executed and delivered conveyance in the following words and figures, to-wit:''

Then follows the deed, describing the premises, and is also a warranty deed made to the trustees, without any other qualification.

''That by the said several conveyances there was transferred to the said University of Arts and Trades the several pieces and parcels of land in said conveyances described, the same to be used solely and only for the purposes set forth in the said articles of incorporation and in the said deed of Jesup W. Scott and Susan W. Scott, dated October 21, 1872, and the qualifications thereof set forth in the deed dated December 19, 1872; said restrictions and qualifications being identical with those set forth in the articles of incorporation of said Toledo University of Arts and Trades.''

Up to that time we have a corporation formed, called the Toledo University of Arts and Trades, for certain specific purposes. The contention of counsel for the relator is that these articles of incorporation and these deeds stamp their character not only upon the whole of the subsequent acts that have been passed, but upon all that has been done for the purpose of maintaining and continuing this university; that their limitations and restrictions are still binding and obligatory upon the institution which is called the Toledo University.

We agree with counsel in that contention. The corporation that is here formed is a corporation formed for the purpose of carrying out the wishes and trust of its founder, Jesup W. Scott.

He sought to establish an institution of learning of such a character and for such purposes as he deemed proper, and which he deemed to be useful and beneficial to his fellow-men. He had a right to place such conditions upon the trust which he created as he saw fit. The act of incorporating the university, while made under the general laws of the state of Ohio, was made for the purpose of carrying out and facilitating and pro-tecting in perpetuity the objects of this trust fund, and is subsidiary to that trust.

This question has been argued and decided in the very cele-bated case, *Dartmouth College* v. *Woodward,* 17 U. S. (4 Wheat.), 518. It will be remembered that Dartmouth College was originally founded for the purpose of educating Indian children in Christianity, and also for some further purposes of education therein specified. It was subsequently sought by the Legislature of the state to take control of that school and appoint new trustees. The case came up and was argued, and was finally appealed to the Supreme Court of the United States. The argument of Mr. Webster in the case was very full and complete upon this point; that the donor of the fund and the founder of the trust could not only stamp upon that trust the characteristics which he desired, *but* that no person had a right to change or alter them; that no state authority had a right to change or alter them. Although a corporation was formed under the authority of the king of England, still the position seemed to be well sustained, that the act of incorporation was simply an incident to the character and use of the trust, and was made not to control the trust, but for the purpose of per-petuating and protecting the trust itself, and was subservient to the objects and purposes of the trust, as declared by the founder of the trust or donation. That view was taken in the very able opinion of Chief-Justice Marshall.

So that the purpose of Mr. Scott, the purposes and objects of this donation, as stated in his deed of trust, the purposes of the donation, as perpetuated and carried out by the articles of incorporation, which were in accordance with the deed of trust, must govern this institution all the way through, unless by some act of those who have power over the fund—the heirs

at law, for instance, of Jesup W. Scott, or by the trustees, act-
ing within their corporate power—some change is made.

The Legislature had no power to change or alter this trust
without the consent of the trustees, nor did they do so, or pro-
fess to do so.

The petition sets forth that there was passed for the gov-
ernment of the city of Cincinnati on April 16, 1870, a certain
act of the Legislature, whereby the common council of the city
of Cincinnati, described as a "city of the first class, now having
a population of 150,000 or more," was authorized and em-
powered to receive donations of land that might have been con-
veyed in trust, or should thereafter be conveyed in trust, for
the purpose of establishing schools and universities. I shall
not go through the reading of the law; it is too lengthy. Sub-
sequently, on April 16, 1873, an act was passed (being Section
4105, Tit. III., Chap. 14, Revised Statutes), by which the Cin-
cinnati act was made applicable to the city of Toledo, except
that "the board of directors shall consist of thirteen members
and the rate of taxation to be assessed and levied shall not
exceed one-half of one mill on the dollar of the taxable prop-
erty of said city." In brief and in substance that act is, that
in this city and as to it, "The common council of the city of
Toledo, in the name and behalf of said city, may accept and
take any property or fund heretofore or hereafter given to the
city, for the purpose of founding, maintaining or aiding a uni-
versity, college or other institution for the promotion of free
education, and upon such terms, conditions or trusts not in-
consistent with law, as the common council may deem expedient
and proper for that end."

This statute enables the trustees of the trust fund to make
a conveyance; and that is true, as we understand it, in regard
to the trustees of this university; the trustees were authorized
to make a conveyance of the property that had been deeded to
them by Jesup W. Scott to the city of Toledo for the purpose
of carrying out the trust. They were not deprived of the trust
in that the city undertook to take it away from them or deprive
them of it without their consent, but they were authorized to
take this step. (And I may say in passing that that was finally

done by a resolution of the board, in which board the heirs at law of Jesup W. Scott were members, and in which they were, it seems, consenting).

Briefly, then, this property was authorized to be conveyed to the common council of the city of Toledo in trust for the uses and purposes to which it had originally been dedicated; and it was provided that there should be a board of trustees, originally thirteen in number, afterwards reduced to five.  Section 4099, Revised Statutes, provides:

"As to all matters not herein or otherwise provided by law, the director shall have all the authority, powers, and control vested in or belonging to said city, as to the management and control of the estate, property, and funds given, transferred, covenanted or pledged to the city for the trusts and purposes aforesaid, and the government, conduct, and control of the university, college or institution so founded; they may appoint a clerk, and all agents proper and necessary for the care and administration of the trust property and the collection of the income, rents, and profits thereof, may appoint the president, professors, tutors, instructors, agents, and servants necessary and proper for such university, college or institution, and determine their compensation; may provide all the necessary buildings, books, apparatus, and means and appliances, and pass all such by-laws, rules, and regulations concerning the president, professors, tutors, instructors, agents, and servants, and the admission, government, and tuition of students, as they deem wise and proper; but they may, by suitable by-laws, delegate and commit the admission, government, management, and control of the students, course of studies, discipline, and other internal affairs of such university, college, or institution, to the faculty which the directors may appoint from among the professors."

On January 18, 1884, the trustees of the Toledo University of Arts and Trades passed a resolution as follows:

"Resolved, That the entire property included in the trust under which the corporation is organized and the subsequent donations in trust received from William H. Raymond, Susan Scott, William H. Scott, Frank J. Scott and Maurice A. Scott be tendered to the city of Toledo on condition that the city will assume the trust under and. by virtue of the power conferred in Sections 4095 to 4105, inclusive, of the Revised Statutes of Ohio."

Subsequently the common council of the city of Toledo passed the following resolution:

"Resolved, That the proposition made by the trustees of the University of Arts and Trades be, and the same is hereby, accepted."

On February 28, 1884, the president of the trustees of the University of Arts and Trades was authorized to make a deed of conveyance of all the trust property belonging to the said University of Arts and Trades to the city of Toledo, and on July 3, 1884, the said trustees of the Toledo University of Arts and Trades, by its president, Richard Mott, duly conveyed all its real estate and other property to the city of Toledo, and that deed of conveyance is set out in the petition. The concluding part is as follows:

"All of the said lots and parts of lots being in the city of Toledo, in the county of Lucas and state of Ohio. Said real estate is hereby conveyed to the city of Toledo subject to the conditions upon which the same was received by the University of Arts and Trades, namely, the promotion of industrial education."

The petition then recites that "on March 18, 1884, the common council of the city of Toledo established a university under an ordinance duly passed therefor in words and figures as follows:"

Section 678 reads as follows:

"There is hereby established a university for the promotion of free education of the youth of both sexes within the city under and by virtue of Chapter 14, Title III, Revised Statutes of Ohio, to be styled and known as The Toledo University."

This is followed by several other sections, and Section 683 reads:

"The first department of such university to be opened shall be designated and known as the Manual Training School, and shall be devoted to instruction in the practical arts and trades."

The petition then states that immediately after the passage of the said ordinance, the said city, in accordance with the provisions of Section 4098, Revised Statutes, appointed certain directors of the university, and the said directors organized

under said appointment, and proceeded to administer the trust, etc. It then recites the fact that a lease was made with the city board of education by the directors for a site for the manual training school, upon which a building was erected. The preamble of that lease is as follows:

"Whereas, it is considered desirable that manual instruction should be furnished to the pupils of the Toledo high school in addition to the studies now pursued, and the Toledo University having made a tender to the board of education of the city of Toledo, Ohio, to furnish said instruction in manual training, and to construct and equip a suitable building for such purpose, providing a site for the erection of such building can be obtained convenient to the Central high school, and it being considered that the most desirable site for such manual training school building is a point immediately adjacent to said high school building, on the northeast side."

They therefore proceeded to make a lease, and upon that a building was erected, in which a manual training school has been conducted for a great many years.

The petition states that there was also passed an act by the General Assembly, on April 11, 1885, amending Section 4103, Revised Statutes, reading as follows:

"The common council of the said city may set apart and appropriate as a site for the buildings and grounds of the university, college or institution so founded, any public grounds of the city not especially appropriated or dedicated by ordinance to any other use or purpose, any law to the contrary notwithstanding; and the board of education of said city may also for a like purpose set apart, convey, or lease for a term of years any ground owned by such board."

The petition avers that the grounds were set apart and used, and were a part of the grounds owned by the board of education. It then sets up a decree of the court of common pleas in regard to the platting of the land, which in our judgment is immaterial at this point, and which I shall pass. It went to the platting of the one hundred and sixty acres, and the manner in which it should be platted.

On April 9, 1873 (70 O. L., 117), the Legislature passed an act entitled "An act supplementary to an act to enable cities

of the first class to aid and promote education, passed April 16, 1870," reading as follows:

"Be it enacted by the General Assembly of the state of Ohio, that the above act shall be applicable to cities of the first class with less than 90,000 and more than 31,500 inhabitants by the last federal census; provided, that in such cities the number of directors shall consist of thirteen, and, provided, that the rate of taxation to be assessed and levied on the taxable property of said city shall not exceed one-half of one mill on the dollar valuation thereof, to be applied by said board of trustees to the support of such university, college or institution of learning."

And that is recited in the petition.

Section 4105, Revised Statutes, as amended April 6, 1900 (94 O. L., 241), was amended so as to read as follows:

"That the provisions of this chapter shall be applicable to cities of the third grade of the first class, except that the rate of taxation to be assessed and levied shall not exceed one-half of one mill upon the taxable property of such cities; and except that the board of directors or trustees shall consist of five members and shall be filled by appointment from persons of approved learning, discretion and fitness for the office, by the board of education and confirmed by the common council in the city in which such university shall be located; such appointments shall be made within thirty days after the passage of this act and one member shall be appointed for one year," etc.

Thereupon five directors were appointed, and the relator says they are now exercising their powers of office.

Section 4104, Revised Statutes, provides that the board of education of the city may, upon the application of said board of directors, assess and levy a tax on the taxable property of the city, and this petition avers that it has been the habit of the board of education to determine the amount that is necessary to be raised upon the request of the directors of the university, and that there has been levied from time to time, from 1884 to 1899, various sums, which are set out in detail in the petition.

It then sets forth—

''That shortly after the appointment and qualification of the said board of directors of the Toledo University under the provisions of the àct of April 16, 1900, the said directors of the said Toledo University established a school under the name of The Toledo Polytechnic School as a department of said Toledo University, in which department they propose and have since conducted a school wherein is taught secondary and academic studies, similar and like unto those ordinarily taught in high school and college preparatory departments, and courses of studies not included in or allowed by the several trusts hereinbefore set forth; and such polytechnic school is not for the promotion of knowledge in arts and trades and the related sciences, and is not designed to furnish artists and artisans with best facilities for a high culture in their respective occupations and industrial education, and is contrary to the trusts heretofore referred to.''

Then it sets forth their curriculum, and states that there is great doubt about the right of the board of trustees to do that, and asks that that may be inquired into. It also avers that ''at the time of the passage of said several acts the city of Toledo was the only city of the third grade of the first class in the state of Ohio, and no municipality did or could become a city of the third grade of the first class between April 16, 1900, and thirty days thereafter.'' And then the petition proceeds to aver that the various acts with regard to the city of Toledo and this school, and the acts of the common council under the same, are in violation of the various articles of the Constitution of the state of Ohio, especially Section 1 of Article XIII and Section 6 of Article XIII, which relate to incorporations; and that the levying of taxes for the purpose of maintaining this school is in conflict with Section 19, Article I of the Bill of Rights of the Constitution. The petition sets forth that these various acts are acts of a general nature, but not of uniform operation throughout the state, and is in violation of Section 26, Article II of the Constitution of the state. It states these various propositions in various forms, and winds up with a prayer which I have already read.

We have seen that the conveyances were made by the board of trustees to the city of Toledo in regard to these trusts, were made upon the same conditions and same trusts as they had been received by the trustees or directors from Jesup W. Scott.

And they were accepted by the city of Toledo upon the same trusts.

It is claimed here first that these acts are wholly unconstitutional, and that all these various acts of the Legislature that permitted the city of Toledo to receive these trust funds or to act upon them are in violation of the Constitution, and are void. That question is an important one, and has been very fully argued by counsel for relators, and upon the first view it seems to be a very strong point. We have discussed it at some length, and the question was raised in our consultation room as to the character of this transaction between the board of trustees and to be a very strong point. We have discussed it at some length, and the question was raised in our consultation room as to the

We therefore commenced some researches in regard to that the city of Toledo, and as to the character of the powers that were sought to be conferred by these acts on the city of Toledo; and the question was raised whether or not the city was in fact receiving any corporate power by virtue of these statutes, and was exercising any corporate power in attempting to carry them out.

We therefore commenced some researches in regard to that question, and were rewarded by finding some cases that we think shed a good deal of light on this question.

In Chapter 15, Section 437, of Dillon on Municipal Corporations (2d Ed.; in a later edition, Section 567), the question is discussed as to the power of municipal corporations to receive property upon trust of the character of which this was, and their right to execute those trusts and to carry out the purposes of the trust; and the general principles were laid down there that they have the right to receive property in trust, at least along the line of the general powers of the corporation, or for purposes that would be beneficial to the inhabitants of the corporation, even if they were to extend a little beyond the ordinary powers of the corporation. More than that. We came upon *Perin* v. *Carey,* 65 U. S. (24 How.), 465, a decision of the Supreme Court of the United States in which certain parties had invoked the action of the courts in regard to the very colleges, as we understand it, that are referred to in these acts

that I have cited, whereby powers were conferred upon the city of Cincinnati to receive trusts and exercise them, etc.   The case is more generally known, however, as the McMicken will case. Charles McMicken, a citizen of Ohio, made his will in 1855, and died in March, 1858, without issue.   So it will be seen that this will was made, and that all the matters in controversy in that case arose and occurred after the adoption of the Constitution of 1851, and before this act was passed which has been referred to. The case was argued by Mr. Headington and Mr. Ewing on behalf of the heirs, and Mr. Pugh and Mr. Perry and Mr. Taft on behalf of the city.   Mr. Taft and Mr. Perry also filed very extensive briefs.   It was very fully and ably argued by these masters of the law.   The case was one in equity, and was a bill filed by the heirs of Charles McMicken to set aside the will.   It sets forth a great variety of reasons why the will should not be carried out or executed, and why the city of Cincinnati could not receive the same or execute the trust.   These points were all argued, eventually, at great length and with great learning. The opinion was delivered by Mr. Justice Wayne, and he devoted about twelve pages of the opinion to a general discussion of bequests and trusts, and the rights of corporations to receive the same.   I will read a portion of it:

"The testator says: 'Having long cherished the desire to found an institution where white boys and girls may be taught, not only a knowledge of their duty to their Creator and their fellow-men, but also receive the benefit of a sound, thorough and practical English education, and such as might fit them for the active duties of life, as well as instruction in all the higher branches of knowledge, except denominational theology, to the extent that the same are now or may be thereafter taught in any of the secular colleges or universities of the highest grade in the country, I feel grateful to God that through his kind providence I have been sufficiently favored to gratify the wish of my heart.'"

I would say that this will contains much broader provisions than in the case at bar.

' "I therefore give, devise, and bequeath to the city of Cincinnati, and its successors, for the purpose of building, establishing and maintaining, as far as practicable, after my decease,

two colleges for the education of boys and girls, all the following real and personal estate, in trust forever, to-wit:' describing the property in nine clauses of the thirty-first article of the will.''

The thirty-fourth article of the will is a direction that the Holy Bible of the Protestant version, as contained in the Old and New Testaments, shall be used as a book of instruction in the colleges. Next, it is declared that in all applications for admission to the colleges, that preference should be given ''to any and all of the testator's relations and descendants, to all and any of his legatees and their descendants, and to Max Mc-Micken and his descendants.''

''Then he directs: 'If after the organization and establishment of the institution, and the admission of as many pupils as in the discretion of the city may have been received, there shall remain a *sufficient surplus of funds,* that the same shall be applied to making additional buildings, and to the support of poor white male and female orphans, neither of whose parents are living, etc., etc., preference to be given to my relations and collateral descendants, etc., etc.; that they were to receive a sound English education, etc., etc., and afterwards, directions are given as to the mode of receiving such poor white male and female orphans, and the privileges to be allowed under certain circumstances.'

''The testator, in the thirty-fourth article of his will, declares that—

''' 'The establishment of the regulations necessary to carry out the objects of my endowment I leave to the wisdom and discretion of the corporate authorities of the city of Cincinnati, who shall have power to appoint directors of said institution.' ''

It was his intention primarily to establish two colleges for boys and girls, and then the third for the support of poor white male and female orphans, neither of whose parents were living, and who were without any means of support, who were to receive a sound English education. This third school was to be founded by applying to the purpose the surplus funds which might remain after the complete organization of the college.

I shall take the liberty of reading at some length from the decision, because it states the law better than I can state it:

"We shall now consider the objection which were made by the counsel for the appellants to the validity of the devises and bequests of Mr. McMicken, that the city of Cincinnati has not the capacity to take them and to execute the trusts of the will, and that no other trustee can be appointed.

"In our view, the answers to them from the opposing counsel were decisive. No incapacity of the city of Cincinnati to take in this instance can be inferred from its charter. It has the power to acquire, to hold and possess, real and personal property, etc., etc., and to exercise such other powers and to have such other privileges as are incident to municipal corporations of a like character and degree, not inconsistent with this act of the general laws of the state (Swan, 960). It was admitted in the argument that the section just read confers power upon the city to acquire and hold real estate for the legitimate objects of the city. These objects are enumerated in many particulars directly connected with its powers to govern the city, and in the nineteen sections following that cited there is not a sentence or word from which an inference can be made that the Legislature meant to deprive the city of Cincinnati from taking and administering charitable trusts. Indeed, such a course would have been inconsistent with the Legislature's caution in its enactments under the Constitution of 1851. It would be doing great injustice to the Legislature even to suppose that it meant, in passing an act for the government of corporations, under the provisions of the Constitution, that it designed to encroach upon that of the judiciary, or to alter the whole power of chancery in respect to charitable uses, and the long-established practice of corporations, private and municipal, to receive them as trustees, and to administer them according to the intention of donors. So from any intention to interfere with such a privilege in the city of Cincinnati, we infer from previous and subsequent legislation that it was to have an important agency in carrying out the sixth article of the Constitution in respect to education. We allude to the act for the better organization and classification of the common schools in Cincinnati and Dayton, passed in the year 1846 (44 O. L. L., 91), and to that of January 27, 1853, both now in force. In the first, the trustees and visitors of common schools in the city of Cincinnati, with the consent of the city council, have the power to establish and maintain out of any funds under the control of the trustees and visitors such other grades of schools than those already established as they may deem expedient for such purpose. Further, by Section 68 of the State School Law, Swan, 852, passed in January, 1856, power is given to town-

ship boards of education, and their successors in office, to take and hold in trust for the use of central and high schools, or sub-district schools, in the township, any grant or donation, or bequests of money, or other personal property, to be applied to the support of such public schools. Again, in 53 O. L., 33, March 26, 1856, it is declared that whenever any one gives land or money for the endowment of a school or academy, not previously established, and shall not provide for the management of it, that the court of common pleas shall appoint trustees with corporate powers. That act provides also for the management of charities when the founders have not given directions; and another act, Swan, 193, 1856, provides how colleges may be incorporated by their own act, and how trustees of an endowment may also become a corporation by their own act. These acts have been cited to show that Ohio, in her legislation, has made municipal corporations trustees for charity devises and bequests, and that the management of them is a duty. They also prove that the privilege to take them is one given and imposed by law.

"After a close examination of all the legislation of Ohio relating to corporations, and its system of education, we have not been able to detect any sentence or word going to show any intent to alter the law as it stood before the adoption of the Constitution of 1851, in respect to a corporation in receiving and taking, either by testament or donation, property for a charity, or to prevent them from having trustees for the execution of it according to the intention of donor. To take such privileges from them can only be done by statute expressly, and not by any implication of statutes, or from any number of sections in statutes analogous to the subject, containing directions for the management of corporations. The law is, that where the corporation has a legal capacity to take real or personal estate, then it may take and hold it upon trust in the same manner and to the same extent as private persons may do. It is true that if the trust be repugnant or inconsistent with the proper purposes for which it was created, that may furnish a good reason why it may not be compelled to execute it. In such a case, the trust itself being good, will be executed under the authority of a court of equity. Neither is there any positive objection, in point of law, to a corporation taking property upon trust not strictly within the scope of the direct purpose of its institutions, but collateral to them, as for the benefit of a stranger or another corporation. But if the purposes of the trust be germaine to the objects of the corporation, if they relate to matters which will promote and perfect these objects,

if they tend to the suppression of vice and immorality, to the advancement of the public health and order, and to the promotion of trade, industry. and happiness, where is the law to be found which prohibits the corporation from taking the devise upon such trust in a state where the statutes of mortmain do not exist, the corporation itself having an estate as well by devise as otherwise? We know of no authority which inculcates such a doctrine, or prohibits the execution of such trusts, even though the act of incorporation may have for its main objects mere civil and municipal government and powers (*Vidal* v. *Girard,* 43 U. S., 126, 190). This court announced the same principal again in the case of *McDonough* v. *Murdoch,* 56 U. S., 367, with other and new illustrations, and with direct reference to the capacity of a corporation to take such trusts, if within its general objects, or such as were collateral or incidental to its main purpose. There is nothing in the Ohio statute of wills to prevent corporations from taking by devise. Much was also said in the argument denying the legality of the trusts, in consequence of the uncertainty of the beneficiaries, and because the relatives of the testator were to have the preference. As to the first, white boys and girls make as distinctive a statute of a class who are to be the first beneficiaries of the trust, and words of the thirty-sixth section, that 'if any surplus shall remain, etc., it shall be applied to the support of poor white male and female orphans, neither of whose parents are living, and who are without any means of support,' makes as certain a description as could have been expressed.

"It seems to us, now, that the objection relative to 'the condition of the beneficiaries is at variance with the established primary rule in respect to a charity, not only with reference to the statute of 43 Elizabeth, c. 4, but to a charity under the common law. The answer is, that a charity is a gift to a general public use, which extends to the rich as well as to the poor (*Jones* v. *Williams,* Amb., c. 651). Generally, devises and bequests having for their object establishments of learning are considered as given to charitable uses, under the statute of Elizabeth (*Attorney-General* v. *Earl of Lansdale*), but that does not make a devise good to a college for purposes not of a collegiate character, intended chiefly to gratify the vanity of the testator. And we can not be mistaken, that a devise to a corporation in trust for any person is good, and will be effectuated in equity (1 Bro. Ch. Cas., 81). And *a fortiori,* a devise to a charitable corporation, in trust for any other charitable use, would be good. All property held for public purposes is

held as a charitable use, in the legal sense of the term charity. Law Library, Vol. 80, p. 116, Grant on Corporations.

"We will not pursue the subject further; for, without having discussed either of the six objections made in the bill of the complainants, or the points made by counsel in support of the demurrer to the bill, numerically, both have been under our examination; for all were appropriately in the argument of the cause, and in th siopinion we mean to decide them all, and have done so.

"We can not announce them more expressively than they were urged in argument:

"1.   The doctrines founded upon 43 Elizabeth, c. 4, in relation to charitable trusts to corporations, either municipal or private, have been adopted by the courts of equity in Ohio, but not by express legislation; nor was that necessary to give courts of equity in Ohio that jurisdiction.

"2.   The English statutes of mortmain were never in force in the English colonies; and if they were even considered to be so in the state of Ohio, it must have been from that resolution by the governor and judges in her territorial condition; and if so, they were repealed by the act of 1806.

"3.   The city of Cincinnati as a corporation is capable of taking in trust devises and bequests for charitable uses, and can take and administer the devises and bequests in the will of C. McMicken.

"4.   Those devises and bequests are charities, in a legal sense, and are valid in equity, and may be enforced in equity by its jurisdiction in such matters without the intervention of legislation by the state of Ohio.

"5.   McMicken's direction, in Section 32 of his will, that the real estate devised should not be alienated, makes no perpetuity in the sense forbidden by the law, but only a perpetuity allowed by law and equity in the cases of charitable trusts.

"6.   There is no uncertainty in the devises and bequests as to the beneficiaries of his intention; and his preference of particular persons, as to who should be pupils in the colleges which he meant to found, was a lawful exercise of his rightful power to make the devises and bequests.

"7.   The disposition which he makes of any surplus after the complete organization of the colleges is a good charitable use for poor while male and female orphans.

"8.   Legislation of Ohio upon the subject of corporations, by the act of April 9, 1852, does not stand in the way of carrying into effect the devises and bequests of the will.

"This cause was argued on both sides with such learning and ability, that we feel it to be only right to the profession to acknowledge the assistance given us in forming our conclusions; and our only regret is, that it should necessarily have extended this opinion to a greater length than we wished it to be."

We think that case decisive of this upon the principal questions involved. We think that case clearly, amply and fully decides that the city of Toledo, irrespective of any special statutes, was fully authorized or empowered to receive this trust, and that these acts that have been referred to in no way affect the right of the city to receive the trusts. The city had the right to receive the trusts and to execute them. A court of chancery, if called upon, would appoint the necessary trustees.

However, it seems to us that the conclusion to be arrived at from this decision, from the character of this trust, is that this is a private matter, and not one of a general nature. It is a college, a university, for a specific, definite purpose, originally founded as such, and carried forward in the various acts by these various statutes as such—a school, not one for a body of men, but for all citizens in the city. Perhaps no other city in the state but the city of Cincinnati would have a school or a college of that kind. Indeed, I do not think that there is another one in the state of Ohio. And we are of the opinion that these various acts, in their application to this school, are in their nature such as may be passed by the Legislature of the state of Ohio and not be in violation of any provisions of the Constitution.

Under these statutes, passed lawfully, the city has the naked legal title to this property. It has the power to confirm the nominations of trustees which are made by the board of education. Beyond that, the whole power of management of this trust and of these schools is placed in the board of trustees. I have read Section 4099, Revised Statutes, and I will not read it again; but it confers all the powers that have been exercised in regard to these schools upon the board of trustees, and this board of trustees is not a corporation. The trustees are not endowed with corporate powers. If authority is necessary upon that, the decision of the Supreme Court of the state of Ohio in

*State* v. *Powers*, 38 Ohio St., 54, decides that even boards of education are not corporations within the provisions of the statutes of the state of Ohio in regard to corporations.

The law does not profess to incorporate the trustees. *State* v. *Davis*, 23 Ohio St., 434, also is a case in support of the proposition that they are not an incorporated body, but are simply endowed with certain powers. Therefore, the objection that is made that these acts confer corporate power upon the city of Toledo, and that therefore they are void, we think falls to the ground.

But if they were void, what then? They would only be void in regard to the exercise of those powers. That would not affect the trust. The trust would remain in the city and a court of chancery would have full power to appoint trustees to carry out the trusts. But that law, in our judgment, is clearly constitutional, and this board is a legal board, and may carry out the provisions of this trust.

There is another proposition in this petition that is brought to our attention, and that is in regard to the so-called polytechnic school. In the view that we take of the case, that the power of the control of this university is vested in the board of trustees, we are of the opinion that this question can not be properly raised in this petition in *quo warranto* without the presence of the members of the board of trustees, at least. We suggest, without deciding, that perhaps it can not be raised at all in this action or in this form of action.

I want to go back a little now—to the formation of this institution. It was formed as the University of Arts and Trades. It was incorporated for the promotion of knowledge in the arts and trades and their related sciences, and to furnish artists and artisans with the best facilities for a high culture in their profession. That character adheres to it to this day, save and except the trustees have brought this under the other clause of the trust; and that is, that other branches of learning not included in the prescribed list may become a part of the curriculum, may become a part of the institution "when endowed so as to be sustained without the use of the trust funds herein provided." If a time shall come when new endowments are

made upon this institution to such an extent that they may carry forward the institution for the promotion of all kinds of education in arts and sciences, or any different department of learning that they see fit to carry forward, provided the endowments are such as to do this without diverting this fund, they may do so. The fund at present yields about $800 per annum. It may be claimed that because the money is raised by taxation to conduct this school, that therefore the time has come when they can do that—when they can extend their branches of education to any department that they see fit. That may be a question of very serious importance. The object of this trust is to "establsh an institution for the promotion of knowledge in the arts and trades and their related sciences, by means of lectures and schools; by extensive collections of mineralogical or other cabinets and museums that relate to the mechanic arts, and whatever else will serve to furnish artists and artisans with the best facilities for a high culture in their professions." The construction of that should be this: The board of trustees having charge of this school, and carrying out the object and purpose of the founder in regard to the promotion of the arts and trades and their related sciences, would have a wide discretion as to what may be taught in the school. The object is to qualify men for work in art. I do not mean technical art, but in the arts and in the trades. You will find by an examination of the definition of the word "arts" that it has a very broad significance. It relates to the adoption of material means to useful purposes. The word "trades" is an exceedingly broad word. Now, whatever will qualify men, artisans, artificers, for the work for which they are destined, which they desire to carry on, may be taught in this school. They can teach no more than that. They may undertake to call it a university, but that does not change the nature of the school or its character. They may call it a polytechnic school; that does not change the character of the instruction that should be given there—whether they call it a polytechnic school or class in natural philosophy, or class in chemistry, no matter about the name. The substance of the thing is, they may teach all that is related to the objects and purposes for which the school is founded, and noth-

ing further, except, as I have already stated, they obtain donations enough to go beyond that.

Whether the question can be raised here or not we are extremely doubtful, even if the members of the board of trustees were made parties. In *State* v. *Board of Ed.,* 7 C. C., 152, and in the case of *State* v. *Newark,* 57 Ohio St., 430, which also cites *State* v. *Board of Ed., supra,* there are references made to this law and to this doctrine. It is also reviewed in the text books. And the view seems to be, without stating it accurately, somewhat like this: First, that there can be no power exercised in *quo warranto* except it be an ouster of the board; that is, if there be an excess of power, it must be reached by another method, to-wit, by a court of chancery by way of injunction. *Quo Warranto* is treated, and always has been, as a matter of law; but corporations being under the control of chancery courts they may be called to account in those courts as to whether they are exceeding their powers. There is perhaps this qualification running through it all; if the body goes so far beyond any powers as to encroach upon the sovereign power; or, as stated at common law, upon the power of the king in derogation of his power, usurping his powers, then the writ of *quo warranto* may lie to the extent that such powers are usurped.

Take the case at bar. This board of trustees is authorized by the terms of the trust to establish an institution for the promotion of knowledge in the arts and trades and their related sciences. They cause education to extend to this branch and that branch, and in the performance of their duty they may step beyond their power and may teach something that in the judgment of some men may not be related to the proposed school, and which may not, either remotely or immediately, qualify men for the performance of those duties connected with the arts and trades. A writ of *quo warranto* to oust the board would not lie. The proper method would be to invoke the aid of a court of chancery to restrain the trustees from causing those branches of education to be taught.

As I have said, we will make no order in regard to that without the presence of the board of trustees as parties, because, under the view that we take, the whole matter is within their

power.   The common council itself established the manual train-
ing school, but the board of trustees established the so-called
polytechnic school.   It is not an act of the council; it is the act
of the trustees.   Hence, they should be made parties.   We make
these suggestions in regard to the matter, so counsel may take it
under advisement, if they desire to, and take such course as they
see fit.

Now, it is said that the levying of the taxes for the school is op-
posed to the provisions of the Constitution of the United States,
especially Section 19, Bill of Rights.   I call attention now to
some sections of the Constitution of the state of Ohio.   Section
7, Article I of the Bill of Rights provides:

"All men have a natural and indefeasible right to worship
Almighty God according to the dictates of their own conscience.
No person shall be compelled to attend, erect, or support any
place of worship, or maintain any form of worship, against his
consent; and no preference shall be given by law to any relig-
ious society; nor shall any interference with the right of con-
science be permitted.   No religious test shall be  *   *   *.   Re-
ligion, morality and knowledge, however, being essential to good
government, it shall be the duty of the General Assembly to
pass suitable laws to protect every religious denomination in
the peaceable enjoyment of its own mode of public worship,
and to encourage schools and the means of instruction."

Well, now, if they may do that by law, they do it through
corporations or through any other boards that are subsidiary
means for carrying the objects and purposes of the corporation.
Article VI, Section 1 of the Constitution provides:

"The principal of all funds, arising from the sale, or other
disposition of lands or other property granted or entrusted to
this state for educational and religious purposes, shall forever
be preserved inviolate and undiminished."

That relates to the school fund of the state.

"Section 2.   The General Assembly shall make such provis-
ions, by taxation or otherwise, as, with the income arising from
the school trust fund, will secure a thorough and efficient sys-
tem of common schools throughout the state; but no religious

or other sect or sects shall ever have any exclusive right to, or control of, any part of the school funds of this state.''

In the Municipal Code, paragraph 34 of Section 1692, it is provided that the common council shall have power ''to acquire by purchase, or otherwise, and to hold real estate, or any interest therein, and other property for the use of the corporation, and to sell or lease the same.'' That was in the same general line that was referred to by the Supreme Court of the United States. It is said that the raising of money by taxation for the support of this school is in violation of the Constitution of the state—Section 19, Article I of the Bill of Rights, which provides that ''Private property shall ever be held inviolate, but subservient to the public welfare,'' etc.

This school has been founded for a most laudable purpose; it has been carried forward in one of its branches in a most useful manner for the citizens of Toledo in the education of children. It receives money from the city, upon levy made by board of education. It is still a private school. This aid that is given by the city by way of taxation is simply, so to speak, feeding the uses and purposes of the trust and the board of education levies the tax because the trustees are carrying on a beneficial course of public instruction—one that is beneficial to the youths and children of the city.

It is shown by the provisions of these various sections of the Constitution to which I have referred, that a leading object and purpose of the Constitution is that the people of the state of Ohio shall be educated. It seemed proper to the members of the constitutional convention of this state that education should be promoted and that schools should be provided in order that the children might be educated. They are levying taxes in this city for the purpose of aiding this school—fitting it, if you please—and that is simply ancillary to the purposes of that trust. It is done, indeed, by the board of education. They are the ones who are authorized to do it. It is a part of the educational scheme; and although it is done, as it is said, by a special law, nevertheless it is rightfully done by a special law, because this body is not a corporation, and its objects and pur-

poses are not of a general nature, so far as this school is concerned.    Nevertheless it has been of benefit to the children of this municipal corporation.    It is done for the end and purpose that a certain amount of education may be acquired in useful branches; more than that, it is done in conjunction with the board of education, because this second deed that is made by Mr. Scott says that the intention and purpose of the donor, the founder of this school was, that it should be carried forward, not in opposition to the common schools or the school system of the state, but in conjunction with it, in extension of it, and for the purpose, as is stated, I think, in almost these words: That they may be educated in departments beyond that which they receive in the public schools of the city of Toledo.    It is carried forward in conjunction with it, and hence it is that the proceeds of this fund may be used, and the work may be carried forward, in conjunction with those who have charge of the school system of the state.    And it so carried forward.    The Legislature has authorized the board of education to levy these taxes for the very purpose of carrying this forward in conjunction with, or in extension and in addition to, the education that is afforded by the public schools.    And clearly, in our judgment, it is not contrary to Section 19, Article I, of the Bill of Rights.

I have in a very hasty and informal manner stated our views upon this question.    It follows from what I have said that the demurrer must be sustained.

*W. H. A. Read,* for relator.

*M. R. Brailey* and *C. A. Friedman,* for defendant.